violative of *Carriger* and the subsequent consent to search the apartment rendered by Horton did not "purge the taint" of the illegal conduct. Accordingly, we reverse the district court's denial of defendants' motions to suppress the evidence seized in Horton's apartment and remand for further proceedings consistent with our determinations.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0258P (6th Cir.)
File Name: 01a0258p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　　*v.*

SHY HEATH (99-6550) and
CARMEN HORTON (99-6549),
　　　*Defendants-Appellants.*

Nos. 99-6549/6550

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00052—Charles R. Simpson III,
Chief District Judge.

Submitted: March 6, 2001

Decided and Filed: August 3, 2001

Before: KEITH, SILER, and CLAY, Circuit Judges.

———————

**COUNSEL**

**ON BRIEF:** Scott C. Cox, Louisville, Kentucky, Mark D. Chandler, Louisville, Kentucky, for Appellants. Terry M. Cushing, Monica Wheatley, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

—————————

## OPINION

—————————

DAMON J. KEITH, Circuit Judge. Defendants-Appellants Shy Heath and Carmen Horton ("Defendants") pled guilty to conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). The defendants entered their respective plea agreements contingent upon their ability to appeal the district court's denial of their motions to suppress evidence discovered pursuant to a warrantless stop of Heath and subsequent search of Horton's apartment. For the reasons that follow, we REVERSE the district court's order denying the defendants' motions to suppress.

### I. BACKGROUND

Officer Rod Seelye, a narcotics investigator for the Louisville Police Department, initially observed Heath in early April of 1998. Officer Seelye testified that his interest in Heath was piqued because he "misidentified [ Heath] and thought he was another person that [he] had been looking at." (J.A. at 85.) Officer Seelye followed Heath and observed him stopping at a location that was reportedly under investigation for drug activity. The officers then followed Heath until he came to a residential apartment building at which time Officer Seelye claimed Heath began to drive suspiciously in that he "circled the block several times... [and] look[ed] in his rearview mirror." (J.A. at 85.) Officer Seelye testified that his "experience and training" indicated that Heath was engaged in behavior "indicative of drug trafficking and looking for a police tail." (J.A. at 85.) The apartment building that Heath entered was "a brick, three-story apartment building with a parking lot. The one common entrance into the building [remains] locked and requires a key." (J.A. at 23.)

building."[8] Appellee's Br. at 53. However, the mere possession of a key will not transform an illegal entry into a valid one. It is the *authority* to enter, not the manner of entry, that provides the legality for the officers' conduct; the most casual reading of *Carriger* reveals that *any* entry into a locked apartment building without permission, exigency or a warrant is prohibited.

As noted earlier, the government argues that Horton's consent to the search was an "intervening act of free will" which "purged [the entry] of its taint." Appellee's Br. at 54 (citing *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). However, it was the officers' illegal entry into the common areas of the building that led them to Ms. Horton's door. Consequently, the consent for the ensuing search and the illegal drugs must be suppressed because they were "gained as a result of [the officers'] presence in the common areas of the building." *Carriger*, 541 F.2d at 552. Accordingly, we hold that the taint of the illegal arrest and entry into the apartment building was not purged by Horton's intervening consent to the search and, thus, the fruits of the consent should have been suppressed as to both defendants.

### III. CONCLUSION

By continuing to detain Heath after failing to connect him with criminal activity, the officers' actions were inconsistent with the limits of a *Terry* stop as set out in *Berkemer*. Further, the officers' entry into the apartment building was

—————————

[8] We note that this argument assumes that Heath could give the officers permission to use the key. The government asserts that Heath's relinquishment of the keys entitled the government to use them to gain entry to the apartment. However, the government conversely contends that Heath lacks the requisite standing to oppose the search of Horton's apartment, arguing that "having a key to a place does not establish standing to challenge a search of the place." Appellee's Br. at 46. While these statements are not entirely contradictory, they conflict inasmuch as the government relies on Heath's consent when justifying the officer's retrieval and use of the keys but then contests his standing to challenge the search effectuated through the use of these keys.

shopping bag, the officers attempted to follow him and found that the "entrance doors were locked and could only be opened by a key or by someone within activating a buzzer system." *Id.* After attempting to enter the building when Beasley was admitted, the officer surreptitiously entered the apartment building and began to search for Beasley. Ultimately the officer witnessed Beasley and Carriger engaged in a conversation at the door of Carriger's apartment. Upon the defendants departure, the officers entered the apartment and conducted a warrantless search that lead to the discovery of heroin. Carriger subsequently filed his motion for suppression of the evidence, which the district court denied.

On appeal, we found that a tenant in a locked building enjoys a "subjective expectation of privacy ... that the Fourth Amendment protects." *Id.* at 551. We further opined that the "peaceable" nature of an officer's entry will not vitiate the degree of infringement; whether it is effectuated "forcibly through a ... window or by guile through a normally locked entrance door," any entry without permission, probable cause or a warrant is "an illegal entry." *Id.* at 550-51. "[B]ecause the officer did not have probable cause to arrest appellant or his accomplice before he invaded an area where appellant had a legitimate expectation of privacy, the subsequent arrest and seizure of narcotics were invalid." *Id.* at 547. We attributed particular significance to the fact that the officers lacked probable cause to arrest the defendants prior to entering the apartment building. *See id.*

We believe that the holding of *Carriger* is applicable here. The officers in the instant matter entered a locked building without utilizing the proper procedure and, therefore, the ensuing search was violative of defendants' subjective expectation of privacy. The government contends that *Carriger* is distinguishable, arguing that the police in this case used "a key lawfully seized from Heath to enter the

Subsequently, through vehicle registration and criminal photo records, Officer Seelye was able to identify the instant defendant as Shy Heath. Officer Seelye also determined that Heath had three misdemeanor convictions and one felony drug conviction. Approximately one week later, Officer Seelye learned from a fellow narcotics officer that Heath was reportedly trafficking large quantities of cocaine. Officer Seelye's counterpart obtained this information from, in that officer's opinion, a "reliable" confidential informant. (J.A. at 87.) Based upon this information, Officer Seelye decided to "continue [his] ... surveillance." (J.A. at 87.)

Officer Seelye surveilled Heath on three other occasions in April.[1] He noted that "Heath and other individuals [would] arrive at the [apartment] and act suspiciously." (J.A. at 87.) Specifically, Officer Seelye described an occasion when a "subject" arrived at the apartment complex in a brown Lexus. Seelye found this notable because Lexus is an expensive vehicle brand. Heath arrived soon after. He stated that Heath circled the area in his vehicle and then "look[ed] around the parking lot" prior to entering the apartment complex. Officer Seelye testified that after being inside for a "short time," the subject exited the premises in what "seemed like a bigger jacket ... walking and he wasn't moving one of his arms." (J.A. at 88.) Officer Seelye speculated that the subject's lack of extremital movement was consistent with someone who was "sort of holding something." (J.A. at 88). He further testified that the subject departed in Heath's vehicle, leaving the brown Lexus parked outside the apartment complex. As noted above, Officer Seelye characterized this incident as "suspicious[]". He described another incident where Heath engaged in countersurveillance, *i.e.*, looking around the parking lot and driving around before parking. On this occasion, Heath parked his car and looked around before removing a pillowcase with something weighing heavily in

---

[1] The record before this Court is silent as to how many times the officers actually observed Heath. However, when Officer Seelye testified regarding the behavior of Heath, he only mentioned three occasions of "suspicious activity," including the day of the defendants' arrests.

the bottom. Heath then entered the apartment complex with the pillowcase and after staying there for a period of time, he departed for his permanent, familial residence. While Heath was inside his family's residence, Officer Seelye testified that he observed "numerous subjects coming and going." (J.A. at 91.) Prior to the day of Heath's arrest, these two events comprise the complete record of suspicious activity reported by Officer Seelye.

On April 27, 1998, the date of Heath's arrest, Officer Seelye testified that he began surveilling the apartment complex at approximately 12:30 p.m. (J.A. at 92.) After "several hours," Heath arrived in a vehicle that was known to belong to Michael Spaulding. (J.A. at 92.) Spaulding was alleged to have been "a large-scale drug trafficker ... [with] prior drug arrests." (J.A. at 92.) After parking the vehicle, Heath "look[ed] around the lot ... retrieved a brown bag from the vehicle" and entered the apartment building. (J.A. at 93.) Heath remained inside for approximately one hour. When he departed the building, Heath was reportedly carrying a "darker colored bag." (J.A. at 95.) Based upon the afore described events, Officer Seelye requested additional officers to report to the area and he proceeded to follow Heath.

According to the testimony of Officer Seelye, Heath demonstrated the behavior of a person "looking for a tail." (J.A. at 96). Heath began "making a lot of turns..driv[ing] faster than the speed limit ... and then he would slow down and drive slowly." Officer Seelye also testified that he *thought* Heath "turned on to a dead-end street." (J.A. at 96.) After following him for fifteen minutes, the officers decided to conduct an "investigative stop" of Heath. Heath drove into a fast food restaurant parking lot, at which point a squad car blocked his passage and Officer Seelye stopped his car behind Heath's vehicle. The officers approached Heath's car with their guns drawn. Officer Seelye testified that upon reaching the driver's side door of Heath's vehicle, he "pulled Mr. Heath from the vehicle and put him up on the side." (J.A. at 98.) He further testified that he wedged Heath between the car door and the body of the car enabling him to "close the

often as he felt'" and a key, established a legitimate expectation of privacy in the apartment).

In the instant matter, there are several indications of "acceptance into the household." Heath "slept on the couch" as often as once a week for approximately two years. (J.A. at 38.) *See also* Appellee's Br. at 46. He also possessed a key which, by the officers' own testimony, allowed Heath unfettered access to the apartment and the ability to admit and exclude others. Moreover, Heath and Horton are cousins; their familial tie is clearly a "relationship" which pre-dates the apartment's use for illegal conduct as contemplated by *Carter*. 525 U.S. at 90. From these facts, it is clear that Heath maintained a legitimate expectation of privacy in Horton's home. We therefore hold that the search of Horton's apartment implicated Heath's Fourth Amendment rights.

*The Entry into the Common Areas of the Apartment Building*

Assuming, arguendo, that these officers could somehow arrive at the outer gate to Horton's apartment building without violating Heath's Fourth Amendment rights, their entry into the building would still be barred. In *United States v. Carriger*, 541 F.2d 545, 552 (1976), we held that when "an officer enters a locked building, without authority or invitation, the evidence gained as a result of his presence in the common areas of the building must be suppressed."

In *Carriger*, police officers were engaged in the surveillance of defendant Beasley, a known drug dealer. In the months preceding the arrest of defendant Carriger, Beasley had unwittingly sold narcotics to undercover officers on several occasions. The officers admitted that the purpose of their efforts on the day of Carriger's arrest "was to order a 'sufficiently large quantity of heroin from defendant Beasley to force him to go, under agents' surveillance, to his source of supply.'" *Id.* at 547. The officers followed Beasley to an apartment building "which Carriger owned and where he maintained an apartment." *Id.* at 548. Having observed Beasley as he entered the apartment building with a green

of law, we review this determination *de novo*.  *See Hill*, 195 F.3d at 264.

Generally, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978) (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)).  The exclusionary rule, as it is commonly known, only allows "defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Id*.  However, "a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Id*. at 142.

In *Jones v. United States,* 362 U.S. 257, 259 (1960), the Court allowed the defendant to challenge the finding of probable cause for the search of "a friend['s]" apartment when the defendant had a key and had spent "maybe a night" but had minimal belongings in the apartment and contributed nothing towards the lease.[7]   The Supreme Court reaffirmed *Jones* in *Minnesota v. Olson,* 495 U.S. 91, 98 (1990), holding "that an overnight guest has a legitimate expectation of privacy in his host's home" that is not diminished because he does not have "complete dominion and control over the apartment." The Supreme Court has further clarified that, when determining whether a defendant is entitled to the protections afforded by *Olson*, reviewing courts should consider whether there was a "previous relationship" with the apartment lessee or if there is any indicia "of acceptance into the household." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998). *See also United States v. Sanganeto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988) (finding that defendant, who had "unrestricted access [,] ... [was] allowed to stay overnight 'as

---

[7]Both the district court and the government have failed to reference and, consequently, distinguish the facts of the instant matter from those in *Jones v. United States,* 362 U.S. 257 (1960), and its progeny.

door[] on [Heath] if [he] had to." (J.A. at 99.)  Despite this tactic, Officer Seelye testified that he feared that Heath "might want to run," thus, he handcuffed him. (J.A. at 99.) He further testified that he instructed Heath that he was "not under arrest." (J.A. at 99.)

Officer Seelye informed Heath that he was conducting a narcotics investigation and  proceeded to question Heath about his whereabouts immediately preceding the instant encounter.  Heath indicated that he was visiting Michael Spaulding. Officer Seelye then asked Heath if he had been to the aforementioned apartment building; he responded that "he hadn't." (J.A. at 100.)  The officers searched Heath and the entire vehicle; nothing of an illegal nature was found. Officer Seelye testified that during the patdown search he "noticed that there were keys in [Heath's] pocket."  (J.A. at 101.) Officer Seelye then attempted to elicit information from Heath regarding the apartment that the keys were used to unlock.[2]  In response to Heath's assertion that the keys and pants belonged to his brother, Officer Seelye asked if Heath would "mind if [he] got them since they're not your keys." (J.A. at 101.)  Heath responded "no" and Officer Seelye removed the keys from his pocket.

At this point, the officers decided to take the keys and gain entry to the apartment building.  Having anticipated this issue arising, Officer Seelye and his supervisor then paged a prosecutor who had researched the issue of whether it would "be the equivalent of a search if [the officers took the] key and tr[ied] to ascertain which door that key goes to."[3]  (J.A.

---

[2]During the officers' surveillance of Heath they were unable to follow Heath into the apartment building and, consequently, had failed ascertain his exact whereabouts once inside.  Officer Seelye testified that "it [wa]s impossible to ascertain which apartment anybody goes into once they go through the common entrance." (J.A. at 89.)

[3]We note that Officer Seelye later recanted this testimony and stated that the prosecutor had researched an issue "similar" to this in another case.  (J.A. at 167.)

at 102.)  Officer Seelye testified that they waited for the prosecutor to return their page and then discussed their plan, *i.e.*, to "take the key and go back to the ... apartment and use the key to test the doors." (J.A. at 103.)  Upon receiving the prosecutor's consent, the officers placed Heath in a police vehicle and proceeded to transport him to the apartment building.  At this point, Officer Seelye estimates that Heath had been detained for "thirty to forty-five minutes." (J.A. at 103.)

Upon arriving at the apartment building, the officers used one of the two keys on the key ring to access the entryway to the common areas of the apartment building.  They then attempted to unlock each door on the first floor with the remaining key.  After their effort on the first floor proved unfruitful,  the officers proceeded to the second floor.  After attempting several doors on the second floor, a female resident entered the hallway and queried the officers regarding their actions.  Upon identifying themselves, the officers asked the resident "if she knew Mr. Heath";  she responded in the negative. (J.A. at 106.)  The officers then asked the resident "if she knew which floor the guys that always show up in the new rental cars and Expeditions, real nice vehicles, what floor do they go to." (J.A. at 106.)  The resident directed them to the third floor where they resumed their door-to-door effort.  Officer Seelye testified that they attempted more than half of the doors on the third floor before finding the corresponding lock.  This apartment was leased to Carmen Horton.  Throughout these events, Heath remained guarded, handcuffed and detained in a police vehicle.

After a brief discussion to determine how they would proceed, the officers decided "to obtain a consent [to search the apartment] from [the] occupant[s]." (J.A. at 107.)  To minimize the appearance of intimidation, one of the three officers departed, leaving Officers Seelye and Taylor to knock on Horton's door.  Horton answered and the officers, with their guns visible, identified themselves as police officers conducting a narcotics investigation and asked if they could "come inside." (J.A. at 107.)  Upon being admitted, the

of course, no reason to suppose that it legitimated the officers' use of the keys to gain entry to the apartment building.

### c.   The Apartment Building

The government argues that Horton's consent to search the apartment vitiated any illegal conduct that might have preceded the officers' discovery of the drugs.  Accordingly, we now turn our consideration to the officers' entry into the common areas of the apartment building and the subsequent search of the apartment.

*Heath's Standing to Contest the Search of the Apartment*

We must first address the district court's finding that Heath lacked "standing to contest the constitutionality of the search of Horton's apartment."[6] (J.A. at 38.)  As this is a conclusion

---

[6] The district court based its determination on our holding in *United States v. McNeal*, 955 F.2d 1067 (1992).  The district court stated:

> The Sixth Circuit has determined that a defendant with a key to an apartment, and little other connection, has no standing to challenge a search of the apartment.  *United States v. McNeal*, 955 F.2d 1067, 1070 (6th Cir. 1992).  The defendant in McNeal had no clothes at the apartment and the facts did not show him to be "more than a casual, transient visitor on that night." *Id.*

(J.A. at 38.)  However, the district court's reliance on *McNeal* in the instant matter is misguided.  In *McNeal* the defendant admitted that he was a "casual, transient visitor." *Id.* at 1070. There, the district court further recognized that "while the defendant *did have* a key to the apartment, he also had keys to other apartments in the complex in which he did not live." *Id.* (emphasis added).  Moreover, the lessee of the apartment could not remember the defendant's last name at the time the officers conducted the search, indicating that there was no significant relationship between these parties. *Id.*  Thus, there were no reliable indications that McNeal had a reasonable expectation of privacy in the apartment.  Additionally, in finding that the district court's decision was beyond our review, we noted that "the trial court's decision was expressly anchored in credibility evaluations of witnesses" not conclusions of law. *Id.* at 1071.  Consequently, the facts of *McNeal* are entirely distinguishable from those in the instant matter.

conclusion compels us to find that this determination was reached in error. Heath made the statements prior to the officers' search of the vehicle. As noted above, the search produced nothing illegal and, consequently, Heath's statements cannot be used to breathe life into a dying investigation. Moreover, the Supreme Court has held that "unless the detainee's answers provide the officer with probable cause to arrest him, he must be released." *Berkemer*, 468 U.S. at 439-40. Because Heath's statements and the subsequent search of the vehicle did not provide the officers with sufficient cause to arrest him, his detention beyond the completion of the search was illegal. *See Butler*, 223 F.3d at 375 (holding that if the stops fails to "reveal anything suspicious, the officers were required ... to allow Defendant to go free").

The defendants also contest the "transport" of Heath and the duration of the stop, arguing that these measures were "too intrusive under the circumstances." Appellant's Br. at 17. Having found that the officers were obligated to release Heath upon the completion of the unfruitful search, it is axiomatic that the transport of Heath and the length of the stop were violative of his Fourth Amendment right to be free from unreasonable seizures. We iterate that while the purpose of an investigative stop is to confirm or dispel the officer's suspicions, these types of detentions are limited in scope; absent the requisite probable cause, an investigative stop must be confined to the site of the initial inquiry.

Manifest in our determination that the officers lacked probable cause to further detain Heath is the conclusion that these officers were not entitled to use the keys. Accordingly, while the retention of the keys is no longer germane to our analysis with regard to the traffic stop, we find the officers' conduct in this regard especially noteworthy. The district court concluded that Heath consented to the officer's removal of the keys from his pocket. However, there is a wide chasm between removal and use; while Heath's consent may have legitimated the removal of the keys from his pocket, there is,

officers asked if she had any marijuana in the apartment explaining that admitting to the possession of "just ... a little bit of marijuana" wouldn't be "that big of a deal." (J.A. at 107.) Horton proffered a small amount of marijuana from two locations within the apartment. Soon after, Horton executed a search consent form and the officers searched the apartment. This form indicated that the consent for the search was obtained at 5:42 p.m. The ensuing search produced digital scales, three empty kilogram wrappers inside a "brown plastic bag" and approximately three kilograms of cocaine separated into several smaller packages. The brown plastic bag appeared to be the same plastic bag that the officers had seen Heath carrying when he entered the apartment building earlier that day. Pursuant to the discovery of these items, Horton and Heath were then read their *Miranda* warnings and placed under arrest.

On May 20, 1998, the grand jury returned an indictment against Carmen Horton and Shy Heath. The defendants subsequently moved to suppress the evidence obtained through the stop and detention of Heath and the search of Horton's apartment. The district court determined that the officers had a reasonable suspicion that Heath was involved in criminal activity warranting the initial stop. The district court further concluded that the scope of Heath's detention was justified, reasoning that the length of time was not excessive and that "Heath's lies to the police" raised the officers' suspicions of illegal activity. (J.A. at 36.) With regard to the seizure of the key and its subsequent use to arrive at the door of Horton, the district court concluded that Heath surrendered the key to the police officers. He further opined that the defendants enjoyed no expectation of privacy in the common areas of the apartment building, and that using the second key to find the apartment once inside was appropriate. Consistent with these findings the district court denied the defendants' motions to suppress and, consequently, each entered a plea of guilty, reserving the right to appeal the

denial of the motions to suppress.[4]   Heath and Horton now each appeal their convictions.

## II. DISCUSSION

Defendants' appellate claims relate to the denial of their motions to suppress evidence. When considering a district court's denial of a defendant's motion to suppress evidence, we review its factual findings for clear error and its legal conclusions *de novo*. *See United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999); *United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999). We review the evidence "in the light most likely to support the district court's decision." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).

Defendants argue that the investigative stop of Heath constituted an illegal seizure, thus his Fourth Amendment rights were violated.   The defendants also contest the entry and search of Horton's apartment.

In analyzing the defendants' Fourth Amendment claims, we have divided the events resulting in the defendants' arrests into three distinct episodes:  1) the initial stop of Heath pursuant to the officers alleged reasonable suspicion of criminal activity; 2) the detention of Heath while the officers attempted to allay their suspicions of criminal activity; and 3) the entry and subsequent search of Horton's apartment. We review each of these episodes in turn.

### a.    The Initial Stop

When the paths of police and citizens cross, the resulting encounter will not always constitute a seizure as contemplated by the Fourth Amendment. A seizure only occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v.*

---

[4]Heath received a sentence of seventy-two months imprisonment and Horton received thirty-seven months imprisonment.

uniformly found that the use of force must be necessary to protect officers from potentially dangerous situations.

Juxtaposed against these cases, the facts in the instant matter suggest that the officers reasonably believed that protective measures were necessary to effectuate the stop of Heath. We have already found that Heath was reasonably suspected of carrying drugs--the agents were, therefore, entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions and, thus, the degree of force utilized was reasonable. *See, e.g., United States v. Bell*, 762 F.2d 495, 500 (6th Cir. 1985).

However, once these officers used all of the appropriate means available to them to allay their concerns of criminal activity, they were required to release Heath. *See Berkemer,* 468 U.S. at 439; *see also United States v. Butler*, 223 F.3d 368, 375 (6th Cir. 2000) ("[O]nce Defendant identified herself, answered the officer's questions, and consented to the patdown which did not reveal anything suspicious, the officers were required under the Fourth Amendment to allow Defendant to go free."). The officers stopped Heath based upon their reasonable suspicion that he was presently engaged in criminal activity. Specifically, the officers believed that the bag that Heath placed in the vehicle contained a large quantity of illegal drugs. However, having searched Heath and his vehicle and finding nothing inherently criminal, the officers were obligated, indeed mandated, to end their investigative stop absent a *newly discovered*, articulable basis for his detention. *See United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995) (finding that "the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention").

The government contends that reasonable suspicion arose from Heath's false statements regarding his whereabouts immediately preceding the investigative stop and the ownership of the keys. The district court agreed. (*See* J.A. at 36.) However,  our *de novo* review of the district court's

any outside time limitation for a permissible *Terry* stop"), the Supreme Court has held that the passage of time can cause an investigative detention to ripen into a defective seizure that must be based upon probable cause. *Place*, 462 U.S. at 709. Moreover, the degree of force utilized by officers during a detention must be "reasonably related in scope to the situation at hand" and not "so intrusive as to constitute an arrest." *United States v. Hardnett*, 804 F.2d 353, 356-57 (6th Cir. 1986).

Having previously found that the officers possessed the requisite suspicion to warrant the stop, our inquiry turns to the second prong of the *Winfrey* test: Whether the means and measures utilized by the officers in the instant matter were "reasonable under the circumstances." *Winfrey*, 915 F.2d at 216. Defendants assert that the officers conduct, *i.e.*, blocking Heath's vehicle, emerging with weapons drawn, pulling Heath from his vehicle, frisking and handcuffing him, "resulted in a *de facto* arrest." Appellant's Br. at 17.

Having considered all of the measures used by the officers, we find that the officers' conduct *in effectuating the stop* of Heath did not rise to the level of an arrest. While the amount of force used by these officers was highly intrusive and, under some circumstances, could be equated with an arrest, the "mere use ... of force in making a stop will not necessarily convert a stop into an arrest .... [When the] surrounding circumstances give rise to a justifiable fear for personal safety, a seizure effectuated with weapons drawn may properly be considered an investigative stop." *Hardnett*, 804 F.2d at 357 (citing *United States v. Greene*, 783 F.2d 1364, 1367-68 (9th Cir. 1986)). This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop. *See, e.g., Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999) (finding that the use of handcuffs does not exceed the bounds of a *Terry* stop); *Hardnett*, 804 F.2d at 357 (holding that approaching a defendant with a firearm drawn was reasonable as the officer had reason to believe the suspect was armed). We have

*Ohio*, 392 U.S. 1, 19 n. 16 (1968). Since *Terry,* courts have recognized that when "a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances." *United States v. Hurst*, 228 F.3d 751, 756-57 (2000) (quoting *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994)). These seizures have become commonly known as *Terry* stops. However, we reiterate that

> *Terry v. Ohio* did not address the reasonableness of an investigative detention; rather, its holding addressed the reasonableness of a protective "frisk," that is, a search that is not supported by probable cause. In cases subsequent to *Terry*, the Supreme Court has held that, under the Fourth Amendment, "a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed ... a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion .... Typically this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'"

*United States v. Fountain, et al.*, 2 F.3d 656, 664 (6th Cir. 1993) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (footnote omitted) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (internal citations omitted))). *See also Florida v. Royer*, 460 U.S. 491, 498-99 (1983) (a temporary *Terry* detention is warranted when the public interest involved is the deterrence of illegal drug trafficking).

In analyzing the circumstances relied upon by the officers in reaching the requisite level of "reasonable suspicion," a brief recital of the factors warranting the stop, as found by the district court, is necessary:

a.  Det. Seelye had observed Heath at a suspected drug location a few weeks prior to the stop.

b.  Det. Seelye knew that Heath had prior convictions including a prior drug trafficking conviction.

c.  Det. Seelye knew from a reliable source that Heath was currently involved in trafficking in large quantities of cocaine.

d.  Det. Seelye had seen Heath use counter-surveillance techniques when arriving at the West Broadway apartment building, especially when he took a package or object into the building.

e.  Det. Seelye saw another man enter the West Broadway apartment building, Heath enter the building a short time later, saw the first man leave the building appearing to carry an object under his jacket, and then saw the man drive away in the car Heath had used to drive to the scene.

f.  Det. Seelye had followed Heath, upon leaving the West Broadway apartment building, to his home on Dixdale and had seen people begin coming and going from the Dixdale residence. This is consistent with drug trafficking.

g.  On the day of the stop, Heath was driving a vehicle registered to Michael Spaulding, a known drug dealer.

h.  Det. Seelye had seen Heath, on the day of the stop, use counter-surveillance techniques in his driving in an attempt to lose any vehicle following him.

(J.A. at 29.)

Based upon these facts the district court found that "the initial stop was plainly reasonable." (J.A. at 29.) Although such facts would not support probable cause to arrest Heath, we find that they were sufficient to satisfy the less stringent standards of *Terry* and *Berkemer* for a brief investigative

detention.[5]  Having "view[ed]... all of the circumstances," we deem the behavior gleaned from the surveillance, coupled with the information relayed by the confidential informant, sufficient to give the officers a reasonable suspicion of ongoing criminal activity. *Knox*, 839 F.2d at 289 (quoting *Mendenhall*, 446 U.S. at 554).  Accordingly, the district court's finding of "reasonable suspicion" was not clearly erroneous.

**b.   The Detention**

The real question is whether this stop, valid at its inception, ripened into an arrest before the cocaine was found and, therefore, was an arrest without the benefit of probable cause. When establishing that a detention, which was not supported by probable cause, was reasonable, the government must demonstrate that: "1) [] the officer's conduct is supported by articulable suspicion, and 2) [] the detention and investigative methods used were reasonable under the circumstances." *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990). "Although an officer may have reasonable suspicion to detain a person or his possessions for investigation, the officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997).  While courts have been reluctant to set a time limit on detentions, *see, e.g., United States v. Place*, 462 U.S. 696, 709 (1983) (declining "to adopt

---

[5]We are mindful that the majority of these factors are attributable to many ordinary, law-abiding citizens.  It has become commonplace for citizens to employ "countersurveillance" tactics when exiting a vehicle or entering a building, especially when carrying packages.  These tactics are often mandated by the realities of a dangerous society.  We further note, however, that our considerations in this case encompass the "totality of the circumstances." *See United States v. Knox,* 839 F.2d 285, 289 (6th Cir. 1988) ("in view of all of the circumstances surrounding the incident") (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  Thus, it is the combination and weight of these factors when considered *en masse* that gives rise to our concurrence in the district court's finding of reasonable suspicion.