**UNITED STATES of America, Plaintiff,**

v.

**Maurice Donald ANDERSON, Jr., Defendant.**

**No. CRIM. 03–50010.**

United States District Court, E.D. Michigan, Southern Division.

July 22, 2003.

Christopher J. McGrath, Novi, Kenneth M. Scott, Flint, for Maurice Donald Anderson, Jr., defendant.

*MEMORANDUM OPINION AND OR-*
*DER DENYING DEFENDANT'S*
*MOTION TO SUPPRESS EVI-*
*DENCE*

GADOLA, District Judge.

Before the Court is Defendant's motion to suppress evidence. The Court conducted an evidentiary hearing in this matter on April 16, 2003. Following the evidentiary hearing, the Court permitted the parties to obtain a transcript and file supplemental briefs. The Government filed its supplemental response brief on May 5, 2003, and Defendant filed his reply brief on May 15, 2003. The Court heard oral argument on June 17, 2003. For the reasons set forth below, the Court shall deny Defendant's motion.

## I. BACKGROUND

At the evidentiary hearing, the Government introduced the testimony of Sergeant Allen McLeod and Sergeant Shawn Ellis, both of the Flint Police Department. Defendant introduced the testimony of Flint Police Officers Ronald Dixon, Terrell Weston, and Richard Besson. Defendant also testified. Having now considered the testimony presented, the Court now sets forth the relevant background in this matter.

On the night of June 19, 2002, Sergeant McLeod was on duty with his partner, Sergeant Shawn Ellis. At about 9:30 p.m. on the night of June 19, the two officers responded to a Flint Police general broadcast requesting cars to check suspected drug activity in the 3600 block of Kleinpell Street in Flint. McLeod and Ellis arrived at the 3600 block of Kleinpell at approximately 10:40 p.m. Neither officer was in uniform, and the officers were driving a semi-marked police cruiser.

Upon arriving at the 3600 block of Kleinpell, McLeod observed that the house located at 3602 Kleinpell was completely dark. McLeod also observed trash on the curb and four individuals standing on or near the porch of the residence. McLeod testified that, based upon the trash and the fact that the house was dark, he suspected that the residents of the house may have either moved out or been evicted. In any event, the house appeared to be vacant. McLeod also testified that the area was known for drug activity and that there was a posted "no loitering, drug area" sign on one of the telephone poles just north of the residence. In addition, McLeod noted that he had made numerous arrests for drug-related offenses in the area. McLeod did notice that other houses on the 3600 block of Kleinpell had at least some lights on at the time that he approached 3602. Moreover, he did not observe any garbage at the curb in front of any other house.

After pulling the cruiser into the driveway of 3602 Kleinpell, McLeod and Ellis approached the individuals who were standing in front of the house. McLeod identified himself as a Flint Police Officer and asked whether any of the four individuals lived at the residence. Although initially all four individual denied living at the residence, one of the individuals, later identified as Defendant Maurice Anderson, stated that his aunt lived in the house. (Hrg. Tr. 15–16.) While McLeod was speaking with the four individuals, he observed a partially smoked marijuana "blunt" on the front porch of the residence. McLeod made no comment regarding the marijuana blunt at that point but continued to converse with the four individuals. At some point thereafter, Defendant stated that he lived at the residence and that he had papers that would prove this fact inside the house. (Hrg. Tr. 17, 18, 40.)

McLeod testified that he and Defendant had discussed why the lights in the house were off. According to McLeod, Defendant indicated that he had smelled what he thought were burning electrical wires in-

side the house. Because of the burning wires, Defendant stated either that he had turned off the power to the house, or that he had turned off the lights. At some point during this conversation, McLeod called for backup, and Officers Terrell Weston and Ronald Dixon arrived on the scene in a marked police car and in full uniform less than five minutes after receiving the call.

In discussing the alleged burning wires inside the house, McLeod testified that Defendant invited McLeod into the house, stating, " 'You can go inside and smell for yourself.' " (Hrg. Tr. 19, 39–40.) McLeod then followed Defendant into the house. McLeod testified that Defendant actually led him into the house and denied that he was holding Defendant by the arm as he was approaching the house. (Hrg. Tr. 41.) Inside the house, McLeod smelled what he believed to be burning or burnt electrical wires. At that point, McLeod asked Defendant where the fuse box was located so that he could shut off the power to the house. Defendant allegedly responded by stating, " 'You're not Consumers Power.' " (Hrg. Tr. 19.) At this point, McLeod was standing just inside the front door of the house in what he believed to be the dining room. McLeod testified that he was standing within five feet of the front door of the house. While standing in this location, McLeod observed, on a small dining room table next to the east wall, right next to the front door, a baggie of suspected cocaine, a digital scale, and bag of sandwich baggies. McLeod immediately recognized the cocaine and advised Defendant that he was under arrest for at least possession of cocaine. At that point, McLeod handcuffed Defendant and called Sergeant Ellis into the residence for assistance. McLeod asked Defendant for permission to search the residence, and Defendant allegedly responded that he was just subleasing the house and that he could not give permission to search. (Hrg. Tr. 21.)

McLeod and Ellis subsequently left the premises for the purpose of obtaining a search warrant, which was issued approximately two to three hours later. McLeod testified that at no point prior to his entry into the residence did he or Sergeant Ellis frisk any of the four individuals present at 3602 Kleinpell.

Sergeant Ellis' testimony largely corroborated Sergeant McLeod's version of events regarding the officers' decision to approach 3602 Kleinpell and the conversation that ensued after the officers arrived on the scene. On direct examination, Ellis confirmed that Defendant had invited Sergeant McLeod into the residence for the purpose of smelling the burning wires. (Hrg. Tr. 67.) On cross-examination, Ellis testified that Defendant had stated to McLeod, "Come on in. Come smell for yourself." (Hrg. Tr. 70.) However, Ellis also admitted that Defendant may have said only, "You can smell it." (Hrg. Tr. 70.) Sergeant McLeod testified that Sergeant Ellis was not present during the point in the conversation when Defendant invited McLeod into the residence, but that Ellis had walked across the street with one of the four individuals to a truck that was parked in the street. (Hrg. Tr. 62.) However, Sergeant Ellis testified that he was in fact standing at the front of the house during the point of the conversation when Defendant purportedly invited McLeod into the house. (Hrg. Tr. 70.) Ellis stated that he was across the street looking at the truck while McLeod was inside the house with Defendant. (Hrg. T. 72.)

Flint Police Officer Ronald Dixon testified that he and his partner, Officer Terrell Weston, were called to 3602 Kleinpell on the night of June 19, 2002 by Sergeant McLeod and Sergeant Ellis. When he arrived on the scene, Dixon observed McLeod and Ellis conversing with four

individuals in the front yard. Dixon testified that he heard Defendant invite McLeod into the residence for the purpose of examining the electrical problem inside the house. (Hrg. Tr. 80.) However, Dixon could not testify with certainty as to the exact words exchanged during the conversation. (Hrg. Tr. 80.) Dixon admitted that Defendant may have said, "You can smell the burning wires." (Hrg. Tr. 81.)

Officer Weston confirmed that he had been called to 3602 Kleinpell on the night of June 19, 2002 by either Sergeant McLeod or Sergeant Ellis. Weston observed McLeod and Ellis conversing with four individuals in the front yard of the residence. Weston testified that he heard McLeod ask Defendant why the lights were turned off inside the house and that Defendant indicated that there was an electrical problem. Weston testified, "I think Sergeant McLeod asked to go and see what the problem was . . . ." (Hrg. Tr. 87.) However, Weston could not recall Defendant's response to McLeod's request. (Hrg. Tr. 88, 89.) Weston observed McLeod enter the house with Defendant and confirmed that Defendant was not handcuffed, in custody, or held at gunpoint when he entered the house with McLeod. (Hrg. Tr. 90.) Weston also testified that he did not see McLeod lead Defendant into the house by his arm. (Hrg. Tr. 90.)

Defendant testified that, on the night of June 19, 2002, he was standing in the driveway of 3602 Kleinpell with three individuals named Joe Dukes, Rod Byas, and an individual identified only as "Tippy." Defendant testified that McLeod and Ellis arrived on the scene, pulled into the driveway, and asked the individuals why they were standing in front of a vacant house. A couple of the individuals in the group denied that the house was vacant. Defendant testified that Ellis then went to the meter on the side of the house and said, "The house has power," and asked whey

the lights were out. (Hrg. Tr. 96.) Defendant testified that he and the others told the two officers that there was an electrical problem in the house, that they had cut off power in the basement, and that Consumers Power had been called.

According to Defendant, McLeod frisked him at the outset of this encounter. (Hrg. Tr. 97.) Defendant also testified that McLeod and Ellis asked him for identification, which he produced. When McLeod asked a series of questions about the house, including the apparent electrical problem, Defendant allegedly stated, describing the burning wires, "You can smell it." (Hrg. Tr. 97.) McLeod then asked Defendant for permission to enter the house, and Defendant testified that "I told him no." (Hrg. Tr. 99.)

At that point, according to Defendant, McLeod took him by the arm, led him up onto the porch, looked into the front window, and then opened the front door. (Hrg. Tr. 98.) With Defendant in front of him, McLeod opened the front door and stuck his flashlight into the house. (Hrg. Tr. 98.) McLeod then took Defendant into the house and asked Defendant if he could search the house. (Hrg. Tr. 98.) Defendant testified, that, in response to McLeod's request, "I told him I hadn't gave him the right to do nothing . . . . He was pretty much doing what he wanted to do." (Hrg. Tr. 98.) When McLeod asked Defendant where the fuse box was located, Defendant told McLeod that McLeod was "not Consumers Power." (Hrg. Tr. 98.) Defendant testified that, after making that comment, McLeod placed him under arrest and took him outside. (Hrg. Tr. 98.)

On February 19, 2003, a federal grand jury returned a three count indictment against Defendant, charging him with: (1) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute crack co-

caine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); and (3) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c).

In his motion to suppress evidence, Defendant raises essentially two issues. First, Defendant contends that, during his initial encounter with the officers in front of the Kleinpell residence, he was "seized" in violation of the Fourth Amendment. Second, Defendant argues that Sergeant McLeod's warrantless entry into the Kleinpell residence violated the Fourth Amendment.

## II. ANALYSIS

### A. Whether Defendant was seized during his initial encounter with the police outside of the Kleinpell residence

Defendant argues that, during his initial encounter with the officers in front of the Kleinpell residence, he was seized in violation of the Fourth Amendment. Defendant's argument is based upon his contention that no reasonable person would have felt free to leave the scene after the police officers arrived and began questioning him in front of the Kleinpell residence.

 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The safeguards embodied in the Fourth Amendment, however, are implicated only after an individual has been "seized." *United States v. Richardson*, 949 F.2d 851, 855 (6th Cir.1991) (Gadola, J., sitting by designation). Moreover, not every encounter between a citizen and police constitutes a seizure. *Id.*
"Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way."

*United States v. Chapman*, 305 F.3d 530, 533 (6th Cir.2002) (quoting *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (citations omitted)). "So long as a 'reasonable person would have felt free to leave the situation, no seizure has occurred within the meaning of the Fourth Amendment.'" *Richardson*, 949 F.2d at 855 (quoting *United States v. Grant*, 920 F.2d 376, 390 (6th Cir.1990) (Guy, J., concurring in part and dissenting in part)). "Factors that may lead a reasonable person to conclude that he is not free to leave include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* at 856 quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

 Here, Defendant and three other individuals were standing on the driveway and front porch of 3602 Kleinpell when they were approached by Sergeants McLeod and Ellis. According to the testimony of McLeod and Ellis, the officers approached the house at 3602 Kleinpell and McLeod identified himself as a police officer. Then, McLeod made inquiry as to why the four individuals were standing in

front of a vacant house, whether any of the individuals resided in the house, and why the lights were not turned on in the house. At that point, according to the testimony of McLeod and Ellis, Defendant invited McLeod into the house to examine the electrical problem for himself.

Under this version of events, none of the four individuals, including Defendant, were "seized" within the meaning of the Fourth Amendment. Indeed, the Court reached a preliminary conclusion at the evidentiary hearing after listening to the direct testimony of Sergeant McLeod, commenting:

> They weren't seized at this point.... Had they attempted to walk away and [McLeod] ordered them to stay there or restrained them in some way, then they would have [been] seized. It never got to that point. There was no seizure at that stage of the proceedings at all. Nobody tried to walk away, and nobody was informed they were in custody. They merely had this conversation that he's related on the porch of the house.

(Hrg. Tr. 38–39.)

In the alternative, even if the Court were to conclude that the officers' initial encounter with Defendant amounted to a "seizure," that seizure was supported by reasonable suspicion.

> An investigatory detention—a brief seizure by police based on reasonable suspicion of criminal activity—is a " 'narrowly drawn' exception to the probable cause requirement of the Fourth Amendment...." *United States v. Sharpe*, 470 U.S. 675, 689, 105 S.Ct. 1568, 1577, 84 L.Ed.2d 605 (1985) (Marshall, J., concurring in the judgment) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 115, 98 S.Ct. 330, 335, 54 L.Ed.2d 331 (1977)). In *Terry*, the Court held that an officer may stop an individual reasonably suspected of criminal activity, question the person briefly, and "conduct a carefully limited search

of the outer clothing ... in an attempt to discover weapons...." *Terry [v. State of Ohio]*, 392 U.S. [1] at 30, 88 S.Ct. [1868] at 1885[, 20 L.Ed.2d 889]. The Court later clarified the nature of a *Terry* stop and stated that

> "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released."

> *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (footnotes omitted).

*Richardson*, 949 F.2d at 856.

■ Here, Sergeant McLeod testified that he and Sergeant Ellis traveled to the 3600 block of Kleinpell in response to a police radio call indicating drug activity in the area. Sergeant McLeod approached the house at 3602 Kleinpell after observing four individuals standing in front of the house. McLeod's suspicions were aroused because the individuals were standing in front of a house that was completely dark and appeared to be vacant. Contributing to McLeod's belief that the house was vacant was a large accumulation of garbage out in front of the house. It appeared to McLeod that the house had recently been vacated. McLeod noted that the other homes on the street did not have such accumulations of garbage in the front yards.

McLeod also testified that the area was known for drug activity, a fact which was indicated by the posting of a sign on a telephone pole which stated, "no loitering, drug area." McLeod also confirmed that he had made numerous arrests for drug offenses in this area. The testimony of Sergeant Ellis corroborated Sergeant McLeod's description of the scene at 3602

Kleinpell when the officers arrived at the residence at about 10:40 p.m. on the night of June 19, 2002.

Based upon the scenario outlined in the officers' testimony, the Court concludes that McLeod and Ellis have set forth articulable facts providing reasonable suspicion for a *Terry* stop. The fact that the officers observed four individuals standing in front of a dark, apparently vacant house in an area known for drug activity was sufficient evidence to provide the officers with reasonable suspicion to briefly detain the four individuals for investigative questioning. Accordingly, even if Defendant was seized during his encounter with McLeod and Ellis outside of 3602 Kleinpell, such seizure was not in violation of the Fourth Amendment.

The Court notes that Defendant's testimony regarding his encounter with Sergeant McLeod differed significantly from the police officers' testimony. As noted above, Defendant testified that McLeod frisked him after approaching the residence and that McLeod then grabbed him by the arm and led him onto the porch before entering the residence without Defendant's consent. If the Court were to accept Defendant's version of events, then it appears that Defendant was seized within the meaning of the Fourth Amendment. Of course, based upon the Court's determination that the officers had reasonable suspicion of criminal activity, a pat down frisk of Defendant would have been justified. However, for the reasons set forth below, the Court finds Defendant's testimony lacking in corroboration and credibility. Accordingly, the Court declines to accept Defendant's testimony on this issue.

Despite the presence of four police officers and three other individuals,[1] the only evidence supporting Defendant's claim that Sergeant McLeod frisked him and then grabbed him by the arm is Defendant's own testimony. None of the officers corroborated Defendant's story. Moreover, the officers' testimony was essentially unimpeached, whereas Defendant's testimony is subject to question. First, Defendant's sworn testimony at the evidentiary hearing on the question of whether he resided at 3602 Kleinpell was impeached by an out of court statement that he made to the police on June 19, 2002. Sergeant McLeod provided uncontroverted testimony that, when questioned at the scene, Defendant initially denied living at 3602 Kleinpell, then stated that his aunt lived there, and then stated that he lived there himself. At the evidentiary hearing, Defendant testified under oath that he did not live at 3602 Kleinpell on June 19, 2002. Thus, if the Court is to accept Defendant's sworn testimony on the question of whether he was living at the Kleinpell residence, it appears that Defendant was untruthful in his initial statements to the officers.[2] Second, Defendant's credibility is undermined by his prior convictions. Defendant was convicted in 1991 for providing false identification to a police officer, in 1996 for reckless discharge of a firearm, and in 1997 for three cocaine possession offenses. On balance, the Court finds Defendant's testimony on this issue to be uncorroborated and less credible than the officers' testimony. For these reasons, the Court declines to accept Defendant's testimony that Officer McLeod frisked him and then grabbed him by the arm. Accordingly, there is no credible evidence supporting Defendant's claim that he was seized in this manner.

---

**1.** None of the three individuals present with Defendant in front of 3602 Kleinpell testified at the evidentiary hearing.

**2.** For reasons set forth *infra,* the Court will accept Defendant's sworn testimony at the evidentiary hearing with respect to his connections to the Kleinpell residence.

For the reasons set forth above, the Court concludes that Defendant was not seized within the meaning of the Fourth Amendment during his initial encounter with the police outside of the Kleinpell residence. Even if this initial encounter constituted a seizure, the Court finds that the police had reasonable suspicion to briefly detain Defendant for the purpose of investigatory questioning. Under either scenario, the police did not violate Defendant's rights under the Fourth Amendment during this initial encounter.

Finally, the Court notes that, even if Defendant was seized in violation of the Fourth Amendment, he is not asserting that any evidence was recovered as a result of that seizure. Rather, it appears that Defendant is claiming that the illegal seizure tainted any subsequent consent that he may have given to the officers to search the house. *See Richardson*, 949 F.2d at 858 ("If consent is given after an illegal seizure, that prior illegality taints the consent to search.... [However,] [i]f consent to search is given at a time that is sufficiently attenuated from an illegal arrest, the taint may be considered to have been dissipated, and evidence discovered during the search will not be suppressed.") (citations omitted). As discussed below, however, Defendant lacks standing to challenge the officers' warrantless entry into the Kleinpell residence and the subsequent seizure of contraband from within the residence. In light of the conclusion that Defendant lacks standing to challenge the officers' entry into the home, whether he was illegally seized during the initial encounter is irrelevant for purposes of his motion to suppress evidence.

## B. Whether Defendant has standing to challenge the warrantless entry into the Kleinpell residence

■ The Government argues that Defendant lacks standing to challenge the police officers' warrantless entry into the residence at 3602 Kleinpell and subsequent seizure of contraband from inside the residence. It is well settled that "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (internal quotation and citations omitted). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134, 99 S.Ct. 421. Accordingly, a defendant bears the burden of establishing that he has standing to challenge the search or seizure. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir.1988). Specifically, "[t]he defendant must satisfy a two-part test: 1) whether he manifested a subjective expectation of privacy in the object of the challenged search; and 2) whether society is prepared to recognize that expectation as legitimate." *Id.* (citing *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)).

■ At the evidentiary hearing, Defendant provided a detailed account of his connection to the Kleinpell residence. (*See* Hrg. Tr. 103–116.)[3] The Court sum-

---

**3.** In his post hearing reply brief on the issue of standing, Defendant cites his out of court statement to Sergeant McLeod that he lived at the Kleinpell residence. For the following reasons, the Court finds that this statement does not provide support for Defendant's argument on the issue of standing. Sergeant McLeod provided uncontroverted testimony that Defendant provided the police officers with three different versions of his connection to the Kleinpell residence. Defendant initially denied living there, then stated that his aunt lived there, and finally stated that he lived there. At the evidentiary hearing, Defendant did not explain the inconsistency in

marizes Defendant's testimony as follows. On June 19, 2002 the date of his arrest, Defendant was in possession of a key to the Kleinpell residence. John Holmes, the current resident of 3602 Kleinpell, had given Defendant the key a week or two prior to June 19, 2002. Holmes had given Defendant the key and had asked Defendant to return the key to the landlord. (Hrg. Tr. 104–106, 109.) Although he possessed a key, Defendant testified that he did not have permission to use the house but was simply supposed to return the key to the landlord. (Hrg. Tr. 109.) Moreover, Defendant had not been staying at the Kleinpell residence during the one to two week period that he was in possession of the key. (Hrg. Tr. 105.) In fact, prior to the date of his arrest, Defendant had not even entered the residence during the time that he was in possession of the key. (Hrg. Tr. 105–106.)

Defendant did have a prior connection with the Kleinpell residence. He had "stayed" there for a year at some point between 1998 and 1999, but had moved out by 1999. (Hrg. Tr. 105, 107–108, 111, 115–116.) While living there, Defendant shared the Kleinpell residence with an individual named Joe Dukes. (Hrg. Tr. 108.) During 2000 and 2001, Defendant returned to the Kleinpell residence from time to time to visit Mr. Dukes. (Hrg. Tr. 108.) At some point, Mr. Dukes moved out of the residence, and Mr. Holmes moved in. Although Defendant had permission to enter the residence when Dukes lived there, he did not have such permission when Holmes was the resident. (Hrg. Tr. 109.) Moreover, Defendant apparently had not been inside the residence during the year

prior to the date of his arrest on June 19, 2002:

Q: So your testimony is, that you were not staying in that house, and had never been inside that house for the year before the day you were arrested; is that correct?

A: Correct.

Q: Let me rephrase that question. Are you testifying that for at least one year before the date of your arrest, you had never been inside 3602 Kleinpell?

A: I wasn't saying—at least—I don't know exactly the date that I hadn't showed up over there.

(Hrg. Tr. at 107.)

On June 19, 2002, Defendant traveled to 3602 Kleinpell after receiving a call from Mr. Holmes. Holmes had called Defendant for assistance with an electrical problem at the house, apparently because Defendant had experienced a similar problem when he resided there. In addition, the electric bill was in Defendant's name. Thus, upon Holmes' request, Defendant telephoned the power company. When Defendant arrived at the Kleinpell residence, Mr. Holmes was present. Upon arrival, Defendant testified that he stepped inside the house, smelled the burning wires, and then stepped out of the house. (Hrg. Tr. 106, 112.) Defendant was present at the house on June 19, 2002 for approximately ten minutes before the officers arrived. (Hrg. Tr. 112–113.) Although Holmes had departed prior to the officers' arrival, Defendant testified that Holmes had left Defendant in charge of

these statements. Rather, Defendant explained in detail under oath that he was not living at 3602 Kleinpell on the date of his arrest. Thus, when given the opportunity to confirm his out of court statements, Defendant confirmed his initial statement—that he did not live at 3602 Kleinpell. Other than his own out of court statements, Defendant's testimony with respect to his connection to the Kleinpell residence was uncontroverted. Accordingly, the Court will accept Defendant's testimony on this issue over his out of court statement to the police that he was living at 3602 Kleinpell.

the house and had given him permission to enter the house and to remain on the porch and driveway. (Hrg. Tr. 113–114.) Defendant also testified that Holmes had essentially left the house in Defendant's hands to take care of the electrical problem. (Hrg. Tr. 116.)

Defendant asserts that these facts establish that he possessed a legitimate expectation of privacy in the Kleinpell residence on June 19, 2002. Defendant relies primarily upon three cases in support of his argument, and the Court briefly outlines the holdings of those cases. In *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Supreme Court held that a defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id.* at 96–97, 110 S.Ct. 1684. In *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the Supreme Court held that a defendant had standing to challenge the search of an apartment where the defendant had permission to use his friend's apartment, had a key to the apartment, kept clothes at the apartment, and had slept at the apartment "maybe a night." *Id.* at 259, 80 S.Ct. 725. Finally, in *United States v. Heath*, 259 F.3d 522 (6th Cir.2001), the Sixth Circuit noted that, "when determining whether a defendant is entitled to the protections afforded by *Olson*, reviewing courts should consider whether there was a 'previous relationship' with the apartment lessee or if there is any indicia 'of acceptance into the household.'" *Id.* at 532 (quoting *Minnesota v. Carter*, 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)).

The present case is readily distinguishable from *Olson*, *Jones*, and *Heath*. Here, there is no evidence that Defendant was an overnight guest at the Kleinpell residence. Defendant kept no clothes or possessions there. Although the current resident,

John Holmes, had given Defendant a key, Defendant testified that he was given this key for the sole purpose of returning it to Holmes' landlord. Moreover, Defendant testified that, prior to the date of his arrest, he had not even entered the Kleinpell residence during the one to two week period that he was in possession of the key. It is clear that Defendant did not possess the key for the purpose of excluding others from the house.

■ The fact that John Holmes may have placed Defendant in charge of the house on June 19, 2002, and given Defendant permission to enter the house and remain on the porch and driveway does not establish that Defendant had a legitimate expectation of privacy in the Kleinpell residence. On June 19, 2002, Defendant was on the premises for approximately ten minutes before the officers arrived. As Defendant testified, "I stepped in, smelled the wires, stepped back out[, and] waited in the driveway for my girlfriend." (Hrg. Tr. 112.) Thus, the fact that, for a brief period of time on June 19, 2002, Defendant may have been "in charge" of the house with permission to enter it and remain in the yard does not establish that he possessed a legitimate expectation of privacy in the residence. "A defendant's legitimate presence on the searched premises, without more, is insufficient to establish standing." *See Sangineto–Miranda*, 859 F.2d at 1510 (internal quotation and citations omitted).

The fact that Defendant had lived in the house during 1998 and 1999 also does not establish that he possessed an expectation of privacy in the house in June, 2002. Defendant admitted that he had moved out of the house in 1999. During 2000 and 2001, he had merely visited his former roommate, Joe Dukes, from time to time. In fact, Defendant admitted that, while he

had permission to go into the house when Joe Dukes lived there, he did not have such permission when John Holmes was living there. Again, the fact that Holmes had given Defendant such permission for a brief period of time on June 19, 2002 does not establish that Defendant had an expectation of privacy in the residence.

Finally, Defendant's relationship with John Holmes does not amount to "acceptance into the household" as described in *Heath*, 259 F.3d at 532. Here, Defendant testified that Holmes was a "friend," that Holmes called Defendant on the date in question for assistance with the electrical problem at the house, and that the electric bill was in Defendant's name. Defendant provided no explanation for why the electric bill was in his name. Moreover, the fact that Holmes relied upon Defendant for assistance with an electrical problem inside the house does not establish that Defendant had an expectation of privacy within the home or the right to exclude others. In *Heath*, the court found that the defendant had standing to challenge a search of his cousin's home where the defendant had " 'slept on the couch' as often as once a week for approximately two years ... [and] possessed a key which ... allowed [defendant] unfettered access to the apartment and the ability to admit and exclude others." *Id.* at 533. There are no such facts in this case.

While the cases cited by Defendant are distinguishable, the court finds the Sixth Circuit's decision in *Sangineto–Miranda*, cited by the Government, relevant to this case. In *Sangineto–Miranda*, the Sixth Circuit affirmed the district court's finding that defendant Nelson lacked standing to challenge a search of his co-defendant's apartment:

At the suppression hearing, Nelson testified that [co-defendant] Betts picked him up at the airport and both men proceeded to the latter's apartment.

Because of the noise level there, they drove to the Pidgeon Perch apartment to transact some business. Nelson did not own or rent that apartment; nor did he have a key. Betts provided the means of entry. Although Nelson asserted that he intended to spend the night there and brought a shirt and pants, he left his red bag with the remainder of his clothing at Betts's residence. The magistrate did not find it credible that Nelson intended to stay in the apartment overnight. Moreover, there was no indication that Nelson had a right to exclude others from the apartment, nor was there any evidence that he took precautions to insure his privacy in any area of the apartment. When the police arrived, Nelson was sleeping on a couch in the living room. At best, the record indicates that Nelson was only a casual visitor. "A defendant's legitimate presence on the searched premises, without more, is insufficient to establish standing." *United States v. Antone*, 753 F.2d 1301, 1306 (5th Cir.) (citing *Rakas*, 439 U.S. at 142–43, 99 S.Ct. at 429–30), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). Nelson has not met his burden of establishing his standing to contest the warrantless entry. *United States v. Meyer*, 656 F.2d 979 (5th Cir.1981).

*Sangineto–Miranda*, 859 F.2d at 1510.

In contrast, the Sixth Circuit concluded that defendant Betts did possess a legitimate expectation of privacy in the Pidgeon Perch apartment. The court noted that

Carl R. Glen, the lessee, testified that Betts had a key to the Pidgeon Perch apartment for about a year, and was afforded unrestricted access "just as any part of our family." [Betts] was allowed to stay overnight "[a]s often as he felt," even without lessee's knowledge or con-

sent. Betts also kept clothes and other items in the apartment. Glen estimated that Betts remained overnight at least eight times within a one-month period.

*Id.* (second alteration in original).

Comparing *Sangineto–Miranda* to the present case, it is clear that Defendant is much more like Nelson than Betts. Defendant's connection to the Kleinpell residence was simply too attenuated to equate him to Betts. Defendant's possession of a key to the Kleinpell residence was not for the purpose of affording him unrestricted access. He kept no clothes or other possessions at the residence and was not staying with John Holmes as an overnight guest. Finally, Defendant's brief presence at the Kleinpell residence on June 19, 2002, even if he was "in charge" of the house and had Holmes' permission to remain on the premises, amounts to no more than the mere "legitimate presence" found insufficient in *Sangineto–Miranda.*

For the reasons set forth above, the Court concludes that Defendant has failed to establish that he possessed a legitimate expectation of privacy in the Kleinpell residence. Without such an expectation of privacy, Defendant lacks standing to challenge the warrantless entry of the Kleinpell residence and subsequent seizure of contraband within the residence. Because Defendant lacks standing, the Court need not address the Government's alternate argument that Defendant consented to Sergeant McLeod's entry into the residence and that McLeod discovered the contraband under the "plain view" exception to the warrant requirement.

## III. CONCLUSION

Accordingly, this Court being fully advised in the premises,

**IT IS HEREBY ORDERED** that Defendant's motion to suppress evidence [docket entry 253] is **DENIED.**

**SO ORDERED.**