*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0240P (6th Cir.)
File Name: 04a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellee,*

　　v.　　　　　　　　　　　　Nos. 03-3348/3351

ANTHONY JACOB (03-3348);
RAMON GALLARDO
(03-3351),
　　　*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-00408—David D. Dowd, Jr., District Judge.

Argued: June 18, 2004

Decided and Filed: July 26, 2004

Before: KENNEDY and GILMAN, Circuit Judges;
SHADUR, District Judge.[*]

—————————————

[*] The Honorable Milton Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

—————————————

## COUNSEL

**ARGUED:** John B. Gibbons, Cleveland, Ohio, Amy B. Cleary, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellants. Ronald B. Bakeman, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** John B. Gibbons, Cleveland, Ohio, Michael G. Dane, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellants. Kenneth S. McHargh, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

—————————————

## OPINION

—————————————

KENNEDY, Circuit Judge. Defendants Anthony Jacob and Ramon Gallardo were indicted for 1) conspiracy to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846 and 2) possession with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2. After both of their motions to suppress were denied, Jacob conditionally pled guilty, reserving the right to appeal the denial of his motion to suppress. Following a jury trial, Gallardo was convicted on both counts.

The defendants Anthony Jacob and Ramon Gallardo appeal the district court's denial of their respective motions to suppress on the ground that the evidence was obtained in violation of their Fourth Amendment rights. Jacob contends that investigators lacked reasonable suspicion to stop the vehicle he was driving. Gallardo, on the other hand, does not challenge the finding that reasonable suspicion existed to stop the vehicle in which he was a passenger. He does argue, however, that his subsequent detention constituted an arrest

without probable cause. Gallardo further appeals the district court's decision to permit the government to introduce an audio recording containing statements made by Jacob in a conversation between them on the ground that the statements were inadmissible hearsay. Finally, Gallardo argues that the district court abused its discretion when it permitted the jury to use a transcript of the audio recording as an aid while listening to the recording. For the following reasons, we AFFIRM.

## BACKGROUND

On September 15th, 2002, members of a drug interdiction task force received information from a confidential informant that Ramon Gallardo had checked into the Ramada Inn, room #217, in Beachwood, Ohio. The task force further learned from the informant that Gallardo was uncertain as to how long he would stay at the hotel, that he had paid in cash, and that he had provided a State of Arizona identification. After receiving this information, Agent Kahler, a member of the task force, ran a criminal history check on Gallardo, which revealed that he had previously been arrested in California for transporting narcotics in 2001.[1]

That afternoon, members of the task force began surveillance of Ramada Inn room #217 and of a green 1999 Toyota Camry. The investigators believed that the Camry was associated with Gallardo because it had State of California license plates and because it was parked in the parking lot near room #217. Due to their suspicion that the vehicle was associated with Gallardo, the investigators requested Ohio Highway Patrol Trooper Terry Helton to bring Alex, a K-9 drug detection dog, to the Ramada Inn to check the Camry. Before asking Alex to check the Camry, Trooper Helton walked Alex around Agent Kahler's vehicle, as he

---

[1]It was later learned that Gallardo had been acquitted of the charges associated with that arrest.

knew it did not have any drugs in it, to test the dog; Alex did not alert. When Alex sniffed the Camry he gave a positive indication to the trunk area of the vehicle and showed interest in the right wheel tire area. Trooper Helton believed, based on the manner in which Alex alerted, that the Camry possibly had a hidden compartment.

The next morning, on September 16th, Gallardo left his room and entered the Camry that investigators had suspected was associated with him. From his hotel, he drove a short distance to a Residence Inn and parked at a side door entrance. Gallardo waited in the parking lot for approximately 15 to 20 minutes before Jacob let him into the hotel through a side door. While he was waiting in the parking lot, Agent Kahler testified that Gallardo constantly scanned the driveway, street and parking lot, which he interpreted as conducting counter surveillance.

Later that morning, the defendants traveled a short distance to a gas station where they were not seen to have purchased anything. Within minutes, they returned to the Residence Inn; upon entering the driveway entrance, the Camry stopped abruptly and paused approximately 15 to 20 seconds. Based on this behavior, the members of the task force believed the defendants were conducting further counter surveillance.

Around noon, the defendants and a female left the Residence Inn with two luggage carts containing various bags, including a green duffel bag later found to contain cocaine. Gallardo and the female loaded the luggage into the trunk. Once the vehicle had been loaded, Gallardo handed the keys to Jacob, who took over the driving of the vehicle.

Investigators, in three or four vehicles, followed the Camry. Trooper Helton, with Alex, the K-9 drug detection dog, was a member of the caravan following the Camry. Agent Riolo, a member of the task force, testified that the investigators planned to continue to surveil the Camry to see if the occupants were going to meet anybody. However, after

following the Camry on the interstate for a short while, investigators believed that their surveillance had been compromised based on the erratic manner in which Jacob was driving. For instance, at the intersection of Interstate 480 and 271, investigators testified that the Camry appeared to be heading toward 480, but rather abruptly changed lanes to remain on 271. It then took the first exit off the interstate. Once the Camry exited the interstate, it drove below the speed limit in an attempt, the investigators believed, to get cars behind it to pass to determine if it was being followed. Consequently, investigators decided to stop the Camry. Immediately before they attempted to do so, the Camry turned into a karaoke club parking lot. It began to drive behind the karaoke club when an officer engaged his lights and sirens on his vehicle in an attempt to stop it. At that point, Agent Khaler testified, the Camry appeared to speed up and then stop. When other members of the surveillance pulled in front of the Camry to block it in, the Camry was observed to lunge forward. Other officers then assisted in stopping the Camry by drawing their weapons and ordering the occupants from the vehicle.

After exiting the vehicle, the defendants were placed on the ground and patted down. While the officers were patting down Jacob, a small amount of marijuana and $1,000 was found on his person. The defendants were handcuffed and placed in the backseat of a patrol vehicle. (The patrol vehicle contained written notice that an active recording device was inside). While the defendants were detained in the vehicle, Trooper Helton had drug detection dog Alex sniff the Camry; Alex gave a positive indication to the presence of narcotics. Agent Kahler testified that approximately 10-15 minutes elapsed between the time of the stop and the time Alex sniffed the Camry. Following Alex's positive indication, investigators searched the Camry and discovered in the trunk a green duffel bag that contained four large bricks and eight smaller bricks of cocaine.

Subsequently, Agent Riolo prepared a transcript of the tape recorded conversation between Gallardo and Jacob that occurred while they were detained in the patrol vehicle. Over defense objection, the district court permitted the jury to use the prepared transcript, which was not admitted as evidence, as an aid during trial. The district court also permitted the jury to use the transcript when the jury requested to hear a portion of the tape again during deliberations. The jury, however, was not given the transcript to take back into the jury room. Rather, after the request, the jurors were brought into the court room where they again received the transcript as an aid while the tape was played.

### ANALYSIS

**A.** We first consider whether the district court erred in denying Jacob's motion to suppress on the ground that specific and articulable facts existed which gave rise to reasonable suspicion to justify the investigatory stop of the Camry.

A district court's factual findings concerning a motion to suppress are upheld unless clearly erroneous. *United States v. Williams,* 962 F.2d 1218, 1221 (6th Cir. 1992). The district court's conclusions of law, such as a reasonable suspicion determination, are reviewed *de novo. Id.*

An investigatory stop of a vehicle is permissible under the Fourth Amendment if supported by reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). Since an investigatory stop is less intrusive to one's personal security than an arrest, the level of suspicion necessary for such a stop is thus "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). For purposes of determining whether reasonable suspicion exists, the Supreme Court has instructed that a reviewing court must consider the "totality of circumstances ... to see whether the detaining officer has a particularized and objective basis for suspecting legal

wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted). The Court further instructed that in considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot. *Id.* at 274-75, 277 (holding that a court may not discount each factor that is readily susceptible to innocent explanation and confirming that a series of seemingly innocent acts can, taken together, give rise to reasonable suspicion).

In arguing that reasonable suspicion did not exist to justify the stop, Jacob contends that the stop of the Camry was not "supported by an objective manifestation that criminal activity was afoot" since the "totality of circumstances relied upon by the District Court Judge were subjective conclusions arrived at by the observation of otherwise innocuous activity."

The district court took into consideration a number of factors that, in their entirety, give rise to reasonable suspicion. Investigators learned from an informant that Gallardo had checked into a hotel, paid cash, and displayed Arizona identification. The district court noted that Arizona is a source state of narcotics that enter the Cleveland area. Investigators further learned that Gallardo had been previously arrested for transportation of narcotics. In addition, a drug detection dog gave a positive indication to the Camry and showed interest in the right wheel tire area, an indication of the possible existence of a hidden compartment. Moreover, the district court found that it was reasonable for an investigator to conclude that the defendants engaged in counter surveillance. Investigators observed Gallardo constantly scan the street, driveway, and parking lot as he waited at Jacob's hotel. They further observed the defendants engage in counter surveillance after they drove to a gas station for no apparent reason. Finally, the defendants appeared to engage in counter surveillance as they drove erratically on the freeway.

We agree with the district court that these facts provided a sufficient basis upon which the investigators conducted a *Terry* stop. Based upon these facts, a well trained officer could reasonably conclude that criminal activity was possibly afoot. Therefore, the investigators were permitted to conduct a stop to investigate their suspicion.

**B.** We next consider whether the investigatory stop ripened into an unlawful arrest based upon the manner in which the officers effectuated the stop and detained the suspects.

"When establishing that a detention, which was not supported by probable cause, was reasonable, the government must demonstrate that ... 'the detention and investigative methods used were reasonable under the circumstances.'" *United States v. Heath*, 259 F.3d 522, 529 (6th Cir. 2001) (quoting *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990)). "Moreover, the degree of force utilized by officers during a detention must be 'reasonably related in scope to the situation at hand.'" *Heath,* 259 F.3d at 530 (quoting *United States v. Hardnett*, 804 F.2d 353, 356-57 (6th Cir. 1986)).

Gallardo argues that he was placed under arrest without probable cause in violation of the Fourth Amendment after he was ordered out of the Camry at gunpoint, handcuffed, and placed in a patrol car.[2] He cites our opinion in *United States v. Richardson*, 949 F.2d 851 (6th Cir. 1991), in support of this argument. In *Richardson*, four officers approached the defendant and an individual, Harris, who was with the defendant, and informed them that they were the subject of a

---

[2]To the extent that Jacob seeks to join this argument, he may not, as the officers had probable cause to arrest him when an officer discovered marijuana on his person shortly after he was ordered out of the vehicle. In his brief, Jacob argues that his "extended detention" was an unlawful seizure. This argument is without merit as his detention in the police vehicle was justified by probable cause. The marijuana was discovered on him within minutes after he was ordered out of the car and before he was placed in the police car.

drug investigation. The officers then asked the defendant for consent to search his vehicle and his nearby storage locker. *Id.* at 854. When he refused to consent, the police removed him from his vehicle and detained him in the back seat of a police car. *Id.* The officers then proceeded to question Harris out of the defendant's earshot. *Id.* After obtaining a confession from Harris, the officers then proceeded to question Richardson and again requested that he consent to a search. *Id.* at 854. This Court, as Gallardo points out, concluded that the agents exceeded the bounds of *Terry* when they placed him in the patrol car because, at that point, the seizure "crossed the line into an arrest," which was unsupported by probable cause. *Id.* at 857. Similarly, Gallardo argues, a court must find that he was placed under arrest without probable cause when the officers placed him in the back seat of a locked police car.

Gallardo also relies upon *Florida v. Royer*, 460 U.S. 491 (1983), in arguing that his detention ripened into an arrest. In *Royer,* Gallardo notes, the Supreme Court held that the limits of a *Terry* stop had been exceeded when the detectives asked the defendant to accompany them to a small room at an airport, gave him no indication that he was free to leave, and retained his flight ticket and driver's license. Since the limits of a *Terry* stop were exceeded in *Royer*, a court must find, Gallardo concludes, that the limits of a *Terry* stop were exceeded in the instant case where he was not only secured in the backseat of a patrol car, but had also been ordered out of the Camry at gunpoint and handcuffed.

Although the plurality in *Royer* did hold that the police conduct in that case had exceeded the limits of a *Terry* stop, 460 U.S. at 507, the plurality also noted that the "scope of the intrusion permitted" in a *Terry* stop "will vary ... with the particular facts and circumstances of each case." 460 U.S. at 500. Ultimately, the Court has instructed that for a temporary detention on less than probable cause to be legitimate, it must satisfy the test of reasonableness. *Royer*, 460 U.S. at 499; *See also Michigan v. Summers,* 452 U.S. 692, 699 (1981); *United*

*States v. Sharpe,* 470 U.S. 675, 683 (1985). The issue is, therefore, whether the investigators' conduct in detaining the defendants and in pursuing a means of investigation that was likely to confirm or dispel their suspicions quickly was reasonable under the circumstances. *Sharpe*, 470 U.S. at 683, 686. We believe that it was.

When the investigators attempted to stop the defendants who were suspected of drug trafficking, the defendants' vehicle lunged forward as if they were attempting to escape. Under these circumstances, the investigators' decision to draw their weapons to prevent an escape was reasonable. *See United States v. Dotson*, 49 F.3d 227, 230-31 (6th Cir. 1995) (finding that officer's use of physical force to restrain defendant who attempted to flee from traffic stop was reasonable); *See also United States v. Haye*, 825 F.2d 32, 35 (4th Cir. 1987) (finding that, as a *Terry* stop is involuntary, use of force to stop a suspect from fleeing is reasonable).

The investigators' decision to order the defendants out of the vehicle as they approached the car and to handcuff them was also reasonable, as concern for the investigators' safety was at its height under those circumstances. This Court has concluded that officers who stop a person who is "reasonably suspected of carrying drugs" are "entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions," and to take reasonable measures to protect themselves. *Heath,* 259 F.3d at 530 (finding it reasonable for agents, after stopping a person suspected of drug trafficking, to draw their weapons to order a suspect out of his car and to frisk and handcuff the suspect); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999) (finding that the use of handcuffs does not exceed the bounds of a *Terry* stop).

We further find that it was reasonable under the circumstances for the investigators to place Gallardo in a police car while the officers pursued their investigation in an attempt to confirm or dispel their suspicions. Gallardo's

reliance upon *Richardson* in arguing that the temporary detention ripened into an unlawful arrest when he was placed in the back of a patrol car is unavailing. The investigatory detention ripened into an arrest in *Richardson*, not merely because the defendant was placed in a police car*,* but rather because placing him in the police car was unreasonable under the circumstances. *Richardson*, 949 F.2d at 857; *See also*, *United States v. Hood*, Nos. 92-5112, 92-5113, 1992 WL 322373 at *4 (6th Cir. Nov. 5, 1992) (unpublished opinion) (finding that placing defendants in the back of a locked patrol car does not, per se, require probable cause). After Richardson refused to consent to a search of his storage locker and vehicle, the agents placed him in the back of a police car and thereafter continued to question him. *Id.* As in *Royer*, what had begun as an inquiry in a public place had escalated into a custodial interrogation in what was in essence a police interrogation room. *Royer*, 460 U.S. at 503. Unlike *Richardson*, the investigators' conduct here was not unreasonable where 1) the defendants had attempted to flee as investigators initiated the stop;[3] 2) the investigators needed to control the stop environment;[4] 3) the police did not question the defendants; and 4) the defendants were placed in a patrol car merely to secure the scene as Trooper Helton, who had been following the Camry, began using the drug detection dog to investigate the investigators' suspicions.

Since the investigators' conduct in effectuating the stop and in detaining the suspects while they diligently pursued a

---

[3]Gallardo argues that the investigators cannot use the fact that the car lunged forward in justifying his detention since he was not driving the Camry. The Supreme Court, however, has noted that "a car passenger ... will often be engaged in a common enterprise with the driver," and that it is reasonable for an officer to infer such a common enterprise. *Wyoming v. Houghton*, 526 U.S. 295, 304-5 (1999); *Maryland v. Pringle*, 124 S.Ct. 795, 801 (2003)

[4]Agent Kahler testified that sometime after the investigators stopped the Camry, news media began gathering at the scene.

means of investigation that was likely to confirm or dispel their suspicions was reasonable under the circumstances, we conclude that the detention did not ripen into an unlawful arrest.[5]

**C.** We next consider whether the district court erred in permitting the government to admit an audio recording that contained a conversation between Jacob and Gallardo over Gallardo's objection that Jacob's statements were inadmissible hearsay. We review evidentiary decisions such as exclusion of hearsay for abuse of discretion. *United States v. Wright*, 343 F3d 849, 865 (6th Cir. 2003). However, the court's legal conclusion concerning whether the statement is hearsay is reviewed de novo. *Maliszewski v. United States*, 161 F.3d 992, 1007 (6th Cir. 1998).

On the apparent assumption that Jacob's statements would be admissible only through the "co-conspirator statement" exception to the hearsay rule, Gallardo addresses only this exception. Gallardo argues that the exception does not apply because Jacob's statements did not further the ends of the conspiracy since no overt acts of concealment followed Jacob's statements designed to conceal the conspiracy. *Fiswick v. United States*, 329 U.S. 211, 216-17 (1946). Additionally, the exception does not apply, he argues, because the statements were not made *during* the conspiracy since the defendants were apprehended when the statements were made.

The defendant does not address, however, whether the statements would be admissible on the ground that they are not being offered for their truth, but are rather being offered to provide context to Gallardo's party admissions. *See United States v. Zizzo*, 120 F.3d 1338, 1338 (7th Cir. 1997) (finding

---

[5]Once the drug detection dog alerted to the presence of drugs shortly after the stop, the investigators had probable cause to search the vehicle. Upon searching the vehicle, the investigators discovered cocaine. At this point, there was probable cause to place the defendants under arrest.

that statements were not admitted for their truth but rather to give context to the conspirators' ends of the conversations). Since we conclude that most of Jacob's statements would be admissible on this ground, we need not address whether they would have alternatively been admissible under the "co-conspirator statement" exception. Any statements that may have been admitted that did not provide context to Gallardo's side of the conversation would still not warrant reversal, as Gallardo has failed to point to any prejudice resulting from the admission of those statements. *United States v. Breitkreutz*, 977 F.2d 214, 221 (6th Cir. 1992) (finding that the defendant failed to establish any prejudice affecting his substantial rights, and therefore declining to reverse the judgment or order a new trial).

**D.** Finally, we consider whether the district court abused its discretion when it permitted the jurors to use a transcript as an aid when listening to the tape recorded conversation between Jacob and Gallardo during the trial and, after they had requested to hear a portion of it again, during deliberations.

We review a district court's rulings as to a jury's use of transcripts under an abuse of discretion standard. *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). A defendant challenging the use of a transcript at trial must show prejudice. *United States v. King*, 272 F.3d 366 (6th Cir. 2002).

Gallardo appears to argue that it was prejudicial *per se* for the district court to permit the jury to use the transcript of the audio conversation during the trial and deliberations without precisely following the procedures set forth in *Robinson.* In *Robinson*, we noted that the ideal procedure for assuring the transcript's accuracy is to have both sides stipulate to a transcript's accuracy. 707 F.2d at 878. In the absence of a stipulation, we advised, "the transcriber should verify that he or she has listened to the tape and accurately transcribed its content. The [district] court should also make an independent

determination of accuracy by reading the transcript against the tape." *Id.* at 879.

This Court has noted that the goal of a procedure as in *Robinson*, "is to provide the jury with transcripts which bear a 'semblance of reliability.'" *United States v. Burke*, No. 97-5889, 1999 WL 617972 at *3 (6th Cir. Aug. 12, 1999) (unpublished opinion) (quoting *Robinson*, 707 F.2d at 879). In *Burke*, the district court judge did not make an independent determination of the transcript's accuracy by reading it while listening to the tape. *Id.* Nonetheless, this Court held that the transcripts contained a 'semblance of reliability' because the transcriber was familiar with the materials he transcribed since he had listened to the conversation between the conspirators while it was initially being recorded. *Id.* at 4. Moreover, the *Burke* court concluded that any error by the district judge was harmless as the defendant was unable to point to even one error in the transcript. *Id.*

In this case, the district court judge did listen to the tape while reading the transcript, but did not make any explicit findings as to the transcript's accuracy. Nonetheless, the transcriber, Agent Riolo, testified concerning how he listened to the tape and prepared the transcript. In particular, he testified that he had spoken with both of the defendants and was thus able to determine who each speaker was on the tape. He also explained that he listened to the tape repeatedly, each time adding to the content of the transcript. This record provides a sufficient basis for a court to conclude that the transcripts bore a semblance of reliability.

Even if the judge erred in failing to make explicit findings concerning the accuracy of the transcript, any error was harmless. Not only did the district court repeatedly instruct the jurors that the transcript was not evidence, but it also emphasized to the jurors that if they did not hear what Agent Riolo said he heard, then they should disregard what he wrote. In addition, this case is unlike *Robinson* where a substantial portion of the tape was inaudible so that the

transcripts, regardless of the judge's instructions to the contrary, became, in essence, the evidence. Here, in contrast, Gallardo did not allege that the tape was substantially inaudible. *Id.* at 878. Rather, Gallardo only points to one alleged discrepancy in the transcript: he argued that the tape reveals Gallardo saying, "ah oh, they found a bag," not, as the government contends, "oh, oh, they found it man." Not only did Gallardo point to only one alleged discrepancy, but he also raised his alternative interpretation both during his cross-examination of Agent Riolo and during his closing argument.

We find, therefore, that Gallardo has not demonstrated prejudice and that the district court did not abuse its discretion in permitting the jury to use a transcript as an aid during the trial and deliberations.

For the foregoing reasons, we AFFIRM.