NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  05a0692n.06
Filed:  August 10, 2005

No. 04-5764

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | On Appeal from the |
| Plaintiff-Appellee, | United States District Court for the |
| | Western District of Tennessee |
| v. | |
| JERRY NORFLEET, | |
| Defendant-Appellant. | |

Before:  KENNEDY and MOORE, Circuit Judges; and RESTANI, Judge.[*]

KENNEDY, Circuit Judge.  The Defendant appeals his conviction and sentence for conspiracy to possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846, the object of which was the commission of an offense in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  The Defendant raises the following arguments.  First, he claims that the district court erred in denying his motion to suppress all physical evidence on the ground that he was unlawfully seized when the vehicle in which he was a passenger was stopped without reasonable suspicion of criminal wrongdoing, and that, even if reasonable suspicion did exist to stop the vehicle, his subsequent detention ripened into an unlawful arrest without probable cause.  The Defendant argues that the district court also erred in denying his motion to suppress recorded

_____

[*] The Honorable Jane A. Restani, Chief Judge for the United States Court of International Trade, sitting by designation.

1

telephone conversations he made while in jail because, he asserts, the recorded conversations were obtained as a result of a *McLaughlin* violation since he was detained for more than forty-eight hours without being brought to a magistrate for a probable cause determination. Next, the Defendant asserts that the government presented insufficient evidence for any rational trier of fact to find him guilty. Finally, the Defendant contends that the district court erred in enhancing his sentence for obstruction of justice and in calculating his base offense level under the guidelines. For the following reasons, we AFFIRM the Defendant's conviction, VACATE the Defendant's sentence, and REMAND for re-sentencing consistent with *United States v. Booker*, 125 S. Ct. 738 (2005).

BACKGROUND

On the evening of December 7, 2000, Sergeant Mark Calvi, a drug detector dog handler, received information that an employee of the U-Stor storage facility in Shelby County, Tennessee, discovered a large sum of cash hidden inside unit T-12 at the U-Stor facility. Since the storage unit's lessee had become delinquent in his payments, a U-Stor employee sought to determine if the lessee had vacated the unit. To do so, the employee cut off the lessee's lock, opened the unit's gate, discovered that the unit had not been vacated, and replaced the lessee's lock with one of U-Stor's locks.[1] On the morning of December 8, 2000, Sgt. Calvi detailed his drug detection dog on various units in the U-Stor facility and received a positive alert on two units, unit T-12 and unit K-3. After receiving these positive alerts, Sgt. Calvi contacted Officer Bierbrodt and requested that he obtain search warrants for those units. He also contacted additional officers to assist him in executing the

---

[1] U-Stor employees find that it is common for lessees who have vacated their units to nonetheless place their lock on the unit after vacating. If, after removing the lessee's lock, the U-Stor employee finds that the lessee has not vacated the unit, then the U-Stor manager will write to the lessee informing him that he must either pay up on the unit or remove his contents or that the contents will be auctioned off.

warrant upon its receipt. These officers positioned themselves in a parking lot of a grocery store adjacent to the U-Stor facility. Meanwhile, the manager of the U-Stor told Sgt. Calvi that some men had come to the U-Stor office on the evening of December 7, 2000, and paid cash to restore the lease on unit T-12. The manager described the vehicle they were driving as a "gold SUV type vehicle." The men also purchased a new lock from the U-Stor facility. After paying up on the unit and purchasing the new lock, the men requested that they be allowed to put their new lock on the unit. Although the men were permitted to put their lock on the unit, which they did, the manager informed them that they still could not immediately gain access to the unit's contents since only the regional manager had the key to the lock that the U-Stor employee had put on the unit that morning, and that he, the local manager, would not be able to get that key until the next day.

While the officers waited for the search warrant, a bronze or gold Ford Explorer drove up to the U-Stor lot and stopped at the entrance gate. The manager told Sgt. Calvi that he believed that this vehicle was the same one that he had seen the previous day when the men had renewed unit T-12's lease. To gain access to the storage facility, one has to input a code at the entrance gate. Each storage unit is assigned a unique code. The driver entered a valid code. Later, the officers learned that the driver had entered the code assigned to unit K-3, the other unit to which the drug detection dog had alerted. After gaining entrance, the Explorer drove toward building T. Sgt. Calvi then called the other officers in to do a take-down to investigate the occupants of the SUV. The officers followed the Explorer which stopped in front of the T building. After positioning vehicles both in front and behind the Explorer to prevent any potential escape, the officers approached the Explorer with their guns drawn, ordered the occupants, who consisted of the driver, Darelle Jones, and the lone passenger, the Defendant, from the vehicle, patted them down, handcuffed them, and placed them in one of the officers' vehicle. In order to secure the scene, the officers transported the

3

Explorer, Jones, and Defendant to the parking lot of the grocery store across the street. When they arrived at the grocery store parking lot, Sgt. Calvi detailed his narcotics detection dog around the Ford Explorer and the dog gave a positive alert. The officers searched the vehicle and found two kilogram wrappers containing cocaine residue. The officers also found Coastal transmission fluid in the rear seat, and two keys, one of which opened the lock that had been placed on unit T-12 the day before.

A short time later, Officer Bierbrodt arrived with search warrants for units T-12 and K-3. Inside unit T-12, officers found several boxes of Coastal transmission fluid, and inside one of the transmission fluid boxes was approximately $56,000 in cash. Officers found a copy of the lease for the unit, which indicated the lessee was Marcus Brown. The address on the lease agreement was the same address as the Defendant's. In unit K-3, the officers found several boxes of Coastal transmission fluid, a cooler containing four kilograms of cocaine, digital scales, and a lease agreement, which indicated the lessee was Nathaniel Phillips.

After his arrest, the Defendant was brought to Shelby County Jail and booked on Friday, December 8, 2000, at 6:24 p.m. While held at the Shelby County jail, the Defendant made five telephone calls, all between the time of 6:30 a.m. and 7:00 a.m. on Saturday, December 9. The calls were recorded and contain numerous inculpatory statements. There are several signs posted near the telephones at the jail that notify the inmates that their telephone calls are subject to monitoring and recording. Moreover, when the recipient of an inmate's call accepts the call (all calls from the jail are collect calls), an audible recording is heard by both participants to the call that informs them that the call is subject to monitoring and recording.

After the jury found the Defendant guilty of conspiracy to possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2,  this appeal followed

ANALYSIS

I.      Motions to Suppress

A.      Physical Evidence

We first consider whether the district court erred in denying the Defendant's motion to suppress all physical evidence on the ground that the officers lacked reasonable suspicion to detain the vehicle in which the Defendant was a passenger, and that the Defendant's detention ripened into an unlawful arrest.[2]  We review a district court's factual findings concerning a motion to suppress for clear error and its determination as to the existence of reasonable suspicion *de novo*.  *United States. v. Jacob*, 377 F.3d 573, 577 (6th Cir. 2004).

An investigatory stop of a vehicle is permissible under the Fourth Amendment if supported by reasonable suspicion of criminal wrongdoing.  *Terry v. Ohio*, 392 U.S. 1, 22 (1968).  Since an investigatory stop is less intrusive to one's personal security than an arrest, the level of suspicion

---

[2] The Defendant also argues that the physical evidence should not have been admitted at trial because, he contends, the government failed to establish chain of custody over the evidence.  We review this claim for abuse of discretion.  *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990).  The Defendant argues that although Detective Selby was the evidence custodian in this case, the government established custody only through the testimony of Officer Bierbrodt, whose name did not appear anywhere on the evidence tags.  Physical evidence is admissible when the possibilities of alteration or misidentification "are eliminated, not absolutely, but as a matter of reasonable probability."  *United States v. McFadden*, 458 F.2d 440, 441 (6th Cir. 1972).  The district noted that since Detective Selby had died before trial, the government could establish custody through someone who had personal knowledge of the transactions that Detective Selby recorded.  The government offered Officer Bierbrodt as someone who had personal knowledge of Detective Selby's handling of the evidence in this case.  The district court concluded that since the government was able to account for each time period of custody regarding the evidence in this case, it eliminated as a matter of reasonable probability that the evidence was somehow altered or misidentified.  The district court did not abuse its discretion in reaching this conclusion.

necessary for such a stop is thus "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). For purposes of determining whether reasonable suspicion exists, the Supreme Court has instructed that a reviewing court must consider the "totality of circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arivizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted).

The Defendant argues that the district court erred in denying his motion to suppress all physical evidence since, he claims, the officers lacked reasonable suspicion to stop the vehicle in which he was a passenger. Thus, we must consider whether the Defendant was unlawfully detained, and, if so, whether the discovered evidence was a fruit of that unlawful detention. *United States v. Smith*, 263 F.3d 571, 594 (6th Cir. 2001); *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996). Because we conclude that the Defendant was not unlawfully detained, we need not address whether the discovered evidence was a fruit of an unlawful detention.[3]

It is clear, in considering all the factors, that the officers had reasonable suspicion to stop the vehicle in which the Defendant was a passenger. After receiving the information that a large amount of cash was discovered in unit T-12 at the U-Stor facility by one of its employees, Sgt. Calvi's drug detection dog gave a positive indication to the odor of narcotics in that unit. The U-Stor facility manager told Sgt. Calvi that men in a gold SUV type vehicle had come to the U-Stor facility the

---

[3] Although the Defendant in his brief argues that *all* the physical evidence should have been suppressed, we note that even if we were to hold, *infra*, that the Defendant was unlawfully detained, that conclusion would not require the suppression of all the physical evidence. First, the evidence obtained from the storage units was not a fruit of the Defendant's claimed unlawful detention as a search warrant had already been sought for those units at the time of his detention. Moreover, the Defendant lacks standing to argue that the search itself of the Explorer was unlawful. He can of course, and he does, argue that the evidence obtained from the Explorer was a fruit of his purported unlawful detention.

6

previous night to pay up on that unit. While Sgt. Calvi was with the U-Stor manager, a gold Ford Explorer entered a valid access code at the entry gate and entered the facility. The manager told Sgt. Calvi that that vehicle was the same one he had seen the previous night. Upon receipt of this information, the officers followed the Ford Explorer, which drove to building T. At this point, the officers seized the vehicle. Clearly, at the moment the officers seized the vehicle, reasonable suspicion existed to believe that the men in the Ford Explorer were possibly engaged in criminal wrongdoing since a reasonable officer could conclude that the men were associated with unit T-12, which they had been told by the facility's manager contained a significant sum of cash, and to which a drug detection dog had given a positive indication of the presence of narcotics.

The Defendant also argues that even if there were reasonable suspicion to detain the vehicle, his subsequent detention ripened into an unlawful arrest without probable cause since the officers approached the vehicle he was in with their guns drawn, ordered the occupants out of their vehicle, handcuffed them, placed them in back of a patrol car, and drove them to the parking lot of a grocery store next to the U-Stor facility. Whether a detention based upon reasonable suspicion ripens into an unlawful arrest without probable cause depends upon whether the officers' conduct in detaining a defendant and in investigating the suspected crime was reasonable under the circumstances. *United States v. Sharpe*, 470 U.S. 675, 683 & 686 (1985); *Jacob*, 377 F.3d at 579 (noting that, in determining whether a detention ripens into an unlawful arrest, the issue is "whether the investigators' conduct in detaining the defendants and in pursuing a means of investigation that was likely to confirm or dispel their suspicions quickly was reasonable under the circumstances"). Moreover, we have noted, "the degree of force utilized by officers during a detention must be 'reasonably related in scope to the situation at hand.'" *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (quoting *United States v. Hardnett*, 804 F.2d 353, 356-57 (6th Cir. 1986)).

7

The officers' decision to approach the vehicle with their guns drawn, order the men out of the vehicle, pat them down for weapons, and to handcuff them was reasonable, as concern for the officers' safety was at its height under those circumstances. This Court has concluded that officers who stop a person who is reasonably believed to be either carrying or dealing drugs "are 'entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions,' and to take reasonable measures to protect themselves." *Jacob*, 377 F.3d at 579 (quoting *Heath*, 259 F.3d at 530). It was also reasonable under the circumstances for the officers to place the Defendant and Jones in a patrol car and to move them across the street in order to maintain the integrity of the scene where the search warrant would be executed and to clear the scene in case someone else, such as a co-conspirator, drove up, during the ongoing investigation. When the officers moved the Defendant, the driver, and the vehicle across the street, Sgt. Calvi promptly detailed his drug detection dog around the vehicle and received a positive alert. This provided the officers with probable cause to search the vehicle. Upon the search of the vehicle, the officers discovered kilogram cocaine wrappers and a key to unit T-12. At this point, the officers had probable cause for the Defendant's arrest. Since the officers' conduct in detaining the Defendant and in pursuing a means of investigation that was likely to confirm or dispel their suspicions quickly was reasonable under the circumstances, we conclude that the Defendant's detention did not ripen into an unlawful arrest.

B.      Recorded Jail Telephone Conversations

We next consider whether the district court erred in denying the Defendant's motion to suppress all the recorded telephone calls he made while in jail. The Defendant submits that, since he was not arrested pursuant to a warrant, the failure to bring him in front of a magistrate within forty-eight hours after his arrest for a probable cause determination violated the Fourth Amendment.

8

*See County of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991). The Defendant argues that "but for this illegal detention, the government would not have been able to obtain the jail house recordings."

The Supreme Court has concluded that although the Fourth Amendment permits warantless arrests, persons arrested without a warrant must be promptly brought in front of a magistrate for a probable cause determination. *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). In *McLaughlin*, the Court defined what is "prompt" under *Gerstein*. 500 U.S. at 47, 56. The Court concluded that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *McLaughlin*, 500 U.S. at 56. The Court went on to note that when "an arrested individual does not receive a probable cause determination within 48 hours, . . . the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id*. at 57.

The Defendant was booked into the Shelby County Jail at 6:24 p.m. on Friday, December 8, 2000. He was not taken before a magistrate until 10:28 a.m. on Monday, December 11, 2000. Thus, he was detained without a probable cause determination for sixty-four hours.[4] Since the Defendant was held in excess of forty-eight hours without a judicial determination as to probable cause, the burden shifts to the government to demonstrate an extraordinary circumstance to justify the delay. It has failed to do so. The fact that the Defendant's detention occurred over a weekend is not an excuse. *See Id.* (noting that intervening weekends do not qualify as an extraordinary

_____

[4] Although the record indicates that he was booked at 6:24 p.m. on Friday, December 8, it does not indicate when he was actually arrested, which would have occurred when the officers discovered the cocaine wrappers and residue in the Ford Explorer. Obviously, this occurred sometime before he was booked. Since the clock for determining whether an arrested individual received a "prompt" judicial determination of probable cause starts running the moment the individual is arrested, the Defendant was held without a judicial determination of probable cause for some amount of time in excess of sixty-four hours.

circumstance). We conclude, therefore, that the Defendant's Fourth Amendment right to be free from unreasonable seizures, as set forth in *McLaughlin*, was violated.

This conclusion, however, does not dictate that the Defendant's recorded conversations made while in jail must be suppressed. The Defendant made the five telephone calls over a half hour time period from 6:30 a.m. to 7:00 a..m. on Saturday December 9th, 2000. When he made these calls, he had only been in custody for a little over twelve hours. Since these telephone calls were made before the *McLaughlin* violation occurred, they cannot be a fruit of his unlawful detention, as his detention did not become unlawful until approximately thirty-six hours after he made the calls. *See United States v. Fullerton*, 187 F.3d 587, 591 (6th Cir. 1999) (concluding that the suppression of evidence obtained before the occurrence of a *McLaughlin* violation is not appropriate since such evidence is not obtained as a result of the violation).

II.     Sufficiency of Evidence

We next consider whether the government offered sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that the Defendant both conspired to distribute in excess of five kilograms of cocaine and aided and abetted the possession of a controlled substance intended for distribution. When a defendant challenges his conviction on the basis of insufficiency of the evidence, we must determine "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bashaw*, 982 F.2d 168, 171 (6th Cir. 1992) (internal quotation marks and citation omitted). Moreover, we draw all reasonable inferences from the evidence in favor of the government. *Id.*

To convict the Defendant of conspiring to distribute a controlled substance and aiding and abetting the possession of a controlled substance intended for distribution, the government must

establish the following. First, to sustain a drug conspiracy conviction under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt "that a conspiracy existed, that the accused knew of the conspiracy, and that [the accused] knowingly and voluntarily joined it." *United States v. Avery*, 128 F.3d 966, 970 (6th Cir. 1997). The government need not prove the existence of a formal agreement; rather, "a tacit or material understanding among the parties will suffice." *Id*. at 970-71. "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id*. at 971. Next, to sustain the aiding and abetting the possession of a controlled substance for distribution charge under 18 U.S.C. § 2, the government must prove that the Defendant knew that the principal possessed drugs with intent to distribute and that the Defendant assisted in the distribution plan. *United States v. Pena*, 983 F.2d 71, 72 (6th Cir. 1993).

The Defendant argues that the government presented insufficient evidence to support a finding of guilt on either the charge of conspiring to distribute in excess of five kilograms of cocaine or on the charge of aiding and abetting the possession of cocaine intended for distribution. The Defendant asserts that the evidence presented at trial establishes that the Defendant was merely riding in Jones' vehicle. He notes that mere association with someone who possesses or deals drugs is insufficient to prove a conspiracy. *See United States v. Gibbs*, 182 F.3d 408, 422 (6th Cir. 1999).

We conclude that the government offered sufficient evidence for a rational trier of fact to find the Defendant guilty beyond a reasonable doubt of both conspiracy to distribute in excess of five kilograms of cocaine and of aiding and abetting the possession of cocaine intended for distribution. The government introduced evidence connecting the Defendant to both units T-12 and K-3. Upon search of the Explorer, officers not only discovered a key to the lock on unit T-12, a unit which contained $56,000 in cash and Coastal transmission fluid boxes, but also kilogram cocaine

11

wrappers and additional Coastal transmission fluid boxes. Although the lease agreement for unit T-12 named Marcus Brown as the lessee, the address on the agreement was the same as the Defendant's.

Most damaging to the Defendant's sufficiency argument, however, are the recordings of the five calls that he made while in jail. In the first recorded call, the Defendant instructs a female friend to tell "Mar" to deny knowledge of Nathaniel Williams and to have Mar say that he got the storage unit in November and that some money was seized from it. He further instructs his female friend to inform Mar to deny having any knowledge as to what was in the storage unit. The Defendant also instructs her to tell Mar that "they" are going to ask Mar who the Defendant is and why Mar and the Defendant have the same address. The Defendant tells her what Mar should say if questioned. The Defendant also instructs her to tell Mar to say that Mar got the storage unit to store lawnmower equipment. Moreover, he instructs her to say that he works in landscaping and to tell Marcus that "they" had to cut the locks in the storage room, because they did not find keys.

In the second telephone call, the Defendant instructs his female friend to hide money and to remove a gun from the house and throw it in the garbage somewhere. He also tells her to tell Marlo to say that he (Marlo) does not know Nathaniel Williams, and to tell individuals that "we ain't snitched on them." He further expresses his desire to have individuals deny knowledge as to drug dealing. In other calls played for the jury, the Defendant requests his female friend to tell individuals to deny knowing Marcus Brown or Nathaniel Williams and that Nathaniel's name is not Nathaniel Williams, but Nathaniel Phillips. Moreover, the Defendant requests that evidence that might connect him to the storage unit be removed.

From these calls, and from the physical evidence introduced, a juror could certainly conclude that the Defendant not only participated in a conspiracy to distribute cocaine, but also sought to have

12

it succeed. In light of this evidence, we conclude that the government introduced sufficient evidence for a rational trier of fact to find the Defendant guilty beyond a reasonable doubt.

III.    Sentencing

The Defendant argues that the district court erred in both calculating his base offense level and in enhancing his sentence for obstruction of justice. While this case was on appeal, the Supreme Court decided *United States v. Booker*, 125 S. Ct. 738, which held that the Sixth Amendment as construed in *Blakely v. Washington*, 124 S. Ct. 2531 (2004), applied to the federal sentencing guidelines. 125 S. Ct. at 755-56. Thus, *Booker* made applicable to the Guidelines the Supreme Court's past holding that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt" or else the Sixth Amendment is violated. *Id*. at 756. Since the Defendant failed to raise a *Blakely/Booker* challenge to his sentence in district court, we can reverse only upon a showing of plain error. *Webb*, 403 F.3d at 380.

In this case, the district court found, based upon the telephone calls that the Defendant made while in jail, that the Defendant obstructed the administration of justice and increased the Defendant's offense level by two levels pursuant to U.S.S.G. § 3C1.1. Thus, based on facts that were neither admitted by the Defendant nor presented to a jury, the applicable sentencing range was increased. The district court's reliance on judge-found facts to increase the Defendant's sentence violated the Sixth Amendment. We thus vacate the Defendant's sentence and remand for re-sentencing. *See United States v. Oliver*, 397 F.3d 369, 378.

While remand for re-sentencing is required under *Booker*, we consider the Defendant's claims regarding the district court's application of the Guidelines since the district court will need

to consider the correct Guideline-recommended sentence in fashioning its own post-*Booker* sentence on remand. *See United States v. McDaniel*, 398 F.3d 540, 551 (6th Cir. 2005).

The Defendant's claims that the district court erred in applying the Guidelines are without merit. The Defendant first argues that the district court erred in applying the obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1. Section 3C1.1 provides for a two-level increase if a defendant "willfully obstructed or impeded . . .the administration of justice during the investigation, prosecution, or sentencing of the instant offense." After reviewing the transcripts of the phone calls that the Defendant made in jail, the district court concluded that the Defendant clearly attempted to obstruct justice. In the phone calls, the Defendant consistently requested that his female friend assist him in providing false information and suborning perjury. The Defendant offers no argument in refutation. The district court did not err in applying the enhancement.

The Defendant also argues that the district court erred in assigning him a base offense level of 32. A defendant is assigned a base offense level of 32 when it is found that he possessed at least five but less than fifteen kilograms of cocaine. U.S.S.G. § 2D1.1(c)(4). In finding a base level of 32, the district court found that the Defendant was responsible for at least five kilograms of cocaine, and thus fell within § 2D1.1(c)(4)'s five to fifteen kilogram range.[5] In addition to the four

---

[5] Although the indictment on which the jury found the Defendant guilty charged the Defendant with conspiring to possess with intent to distribute *in excess of five kilograms* of cocaine, the jury never made (or was asked to make) a finding as to the quantity of cocaine that the Defendant possessed. Rather, the district court judge instructed the jury as follows: "You will note that the indictment charges that a particular amount of cocaine was the object of the conspiracy. It is not necessary that the government prove an exact quantity of cocaine. It is sufficient if the government proves beyond a reasonable doubt that a measurable quantity of cocaine was the object of the conspiracy." Prior to the giving of these instructions, the parties had agreed to bifurcate the conspiracy charge issue from the quantity issue. That is, if the jury found the Defendant guilty on the conspiracy charge, the parties then planned to have the jury decide the quantity of cocaine the Defendant possessed. After the Defendant was found guilty, however, the jury was never asked to find the quantity of cocaine the Defendant possessed. At the sentencing hearing, Defendant's counsel noted to the judge that "we did not ask [the jury] to make a specific finding as to quantity."

14

kilograms of cocaine found in unit K-3, the district court found that the Defendant could be held responsible for either an additional two kilograms of cocaine due to the two individual kilogram wrappers found in the Explorer or for an additional three kilograms of cocaine due to the $56,000 seized in unit T-12, which converted into three kilograms of cocaine. The Defendant asserts that the district court erred in holding him accountable for three kilograms of cocaine because of the $56,000 found in unit T-12 and for two kilograms of cocaine because of the two kilogram cocaine wrappers discovered in the Explorer. He only argues, however, "that there was insufficient evidence . . . linking Defendant's alleged drug activities to the money." He does not explain why it was erroneous for the district court to hold him accountable for two kilograms due to the two individual kilogram wrappers found in the Explorer. Thus, even excluding the "cash equivalent" three kilograms, the Defendant would still have been held accountable for 6 kilograms of cocaine, which would have resulted in the same base level of 32, since 6 kilograms falls within the 5 to 15 kilogram range provided by U.S.S.G. § 2D1.1(c)(4). In any event, the district court properly held the Defendant accountable for the "cash equivalent" three kilograms because, as outlined above in the Sufficiency section of this opinion, the government offered sufficient evidence for the district court to conclude that the money seized was linked to the Defendant's drug activities.

---

The district court judge replied that the indictment, which he read to the jury, charged that the Defendant conspired to distribute in excess of five kilograms of cocaine "but, of course, when we gave the instructions [to the jury], we talked about the standard instructions." The judge continued by noting that "[i]t is sufficient [for conviction] if the government proves beyond a reasonable doubt that a measurable amount of cocaine was the object of the conspiracy, and that was stated . . . and I think everybody was clear that that was the instruction that was desired in the case." The district court judge went on to find "by a preponderance of the evidence" that the quantity of cocaine the Defendant was responsible for exceeded five kilograms. This finding then, made when the Guidelines were mandatory, violated the Defendant's Sixth Amendment right.

15

IV.  For the foregoing reasons, we AFFIRM the Defendant's conviction, VACATE the Defendant's sentence, and REMAND for re-sentencing in light of this opinion and the Supreme Court's opinion in *Booker*.